**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Brandon RICHTER, Defendant–Appellant.**

**United States of America, Plaintiff–Appellee,**

v.

**Tor Olson, Defendant–Appellant.**

**Nos. 13–1316, 13–1319.**

United States Court of Appeals, Tenth Circuit.

July 31, 2015.

1174

Dean Neuwirth, Dean Neuwirth, P.C. (Keyonyu X O'Connell of The Law Office of Keyonyu X O'Connell, with him on the briefs), Denver, CO, for Defendant–Appellant Richter.

William J. Leone (Alex W. Trautman, with him on the briefs), Fulbright & Jaworski, LLP, Denver, CO, for Defendant–Appellant Olson.

Robert Mark Russel, Assistant United States Attorney (John F. Walsh, United States Attorney, with him on the briefs), Denver, CO, for Plaintiff–Appellee.

Before KELLY, LUCERO, and McHUGH, Circuit Judges.

## I. INTRODUCTION

McHUGH, Circuit Judge.

This case arises out of Brandon Richter and Tor Olson's business selling electronic devices for export overseas. The government brought criminal charges against Mr. Richter and Mr. Olson for fraudulently obtaining the electronic devices they exported and for violating federal law governing the exportation of hazardous electronic waste. After a fifteen-day trial, the jury found them guilty of committing fraud and facilitating the illegal exportation of hazardous waste, and it also convicted Mr. Richter on a single count of obstruction of justice. On appeal, Mr. Richter and Mr. Olson raise a variety of legal and evidentiary challenges to these convictions. Exercising jurisdiction under 28 U.S.C. § 1291, we AFFIRM in part and REVERSE in part.

## II. BACKGROUND

### A. Factual History

Mr. Richter and Mr. Olson served, respectively, as the Chief Executive Officer and Vice President of Operations for Executive Recycling, Inc. (Executive), a waste removal and recycling business. The company, founded in 2004 by Mr. Richter, provided electronic waste removal and recycling services to various businesses, governments, and government entities in Colorado, Utah, and Nebraska. Specifically, the defendants[1] promised potential customers that Executive would domestically recycle or destroy electronics that could

---

1. Mr. Richter and Mr. Olson are the only parties before this court on appeal. Thus, for

not be resold and would do so in an environmentally friendly manner that complied with all environmental laws and regulations governing electronic waste.

Generally speaking, electronic waste, or e-waste, refers to used electronics such as computers, printers, keyboards, speakers, and phones that are destined for disposal or recycling. Proper disposal of these types of electronic devices, whether by resale, by destruction, or by reduction to raw materials that can be resold, is difficult and expensive because the devices contain toxic materials. For example, Cathode Ray Tubes (CRTs) are "the glass video display component of an electronic device, usually a computer or television monitor, and are known to contain lead." CRTs cannot be disposed of in a landfill because of the risk that the lead will leach into the soil.

Executive contracted to dispose of e-waste for a number of government and business entities in Colorado, including the City and County of Boulder, the City and County of Broomfield, the Denver Newspaper Agency, El Paso County, and the Jefferson County School District. The defendants promised these customers that any electronic devices delivered to Executive would not be shipped overseas, would be processed in the United States, and would be totally destroyed in compliance with all environmental laws.

Contrary to its promises, Executive sold many items for overseas export to Hong Kong and China. Between 2005 and 2008, Executive served as the exporter of record in over three hundred exports and received over $1.9 million from its top five

brokers in exchange for used electronics. Of particular relevance, the company sold CRTs to brokers in China for eventual reuse or refurbishment as components in new monitors. Over a four-year period, Executive sold 142,917 CRTs to their top five overseas brokers.

One shipment to Hong Kong, the "GATU shipment," contained CRTs that were broken and did not work, and thus could not be reused. The GATU shipment was featured in an episode of a television news program, *60 Minutes*, which called into question Executive's compliance with environmental statutes and regulations. The program also brought Executive to the attention of the authorities.

As a result, the Environmental Protection Agency (EPA), Immigration and Customs Enforcement (ICE), and the Colorado Attorney General's Office began investigating Executive. An EPA investigator asked Mr. Richter to supply records of Executive's shipments over a three-year period. In response, Mr. Richter provided only a handful of records. One was a record corresponding to the GATU shipment. The subsequent execution of a federal search warrant revealed more shipping records that Mr. Richter had not produced. Some of these documents, including the original record for the GATU shipment, had been shredded. Upon closer inspection, EPA investigators discovered that the GATU record previously produced by Mr. Richter had been altered before it was provided to the EPA.

### B. Procedural History

In the United States District Court for the District of Colorado, the government

simplicity's sake our references to the defendants, unless otherwise indicated, concern

only them and not Executive.

charged Executive, Mr. Richter, and Mr. Olson with thirteen counts of mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343; one count of exporting hazardous waste in violation of the Resource Conservation and Recovery Act (RCRA), 42 U.S.C. § 6928(d); and one count of smuggling hazardous waste, in violation of 18 U.S.C. § 554 and the same RCRA provision. According to the government, the defendants violated environmental laws regulating hazardous waste when they exported the CRTs (both broken and intact) overseas, and their actions in shipping the CRTs overseas were contrary to the representations made to customers. The government also charged Mr. Richter and Mr. Olson with obstruction of justice, in violation of 18 U.S.C. § 1519.

Before trial, the defendants moved for dismissal of the mail and wire fraud charges, arguing that the indictment failed to allege a deprivation of money or property as required by 18 U.S.C. §§ 1341 and 1343. Specifically, the defendants argued that Executive's customers were not deprived of money because they obtained the benefit of the services they paid for—removal of e-waste—and they were not deprived of property because the e-waste had no value in the hands of the customers. The district court denied the motions.[2]

The parties also raised pretrial motions concerning the jury instructions on the RCRA and smuggling charges. Both of

these criminal charges were based on the government's allegations that the defendants had exported, and facilitated the export of, regulated "hazardous waste" in violation of federal law. The parties' disagreement with respect to the jury instructions focused on the proper definition of waste under Colorado law.[3] The government argued the jury should be instructed on the relevant regulations, as well as the Colorado Department of Public Health and Environment's (the Department) guidance interpreting those regulations, while the defendants claimed only the regulation should be included in the jury instruction. The district court agreed with the government that the Department's interpretation of the regulation was "relevant to the jury's determination of whether the electronic materials at issue in this case were waste." It therefore adopted a waste instruction, which stated that a used electronic device or component becomes waste on the date that a recycler determines it cannot be resold, donated, repaired, refurbished, or reused for its original intended purpose.

At trial, the defendants continued to challenge the government's allegation that they violated the law by exporting hazardous waste. First, Mr. Richter and Mr. Olson asserted that even if broken CRTs are regulated waste, they did not know Executive's shipments contained broken CRTs. In support of this theory, Mr. Olson offered three e-mails as evidence that he was not responsible for loading CRTs into shipping containers and that he had taken

---

**2.** At the close of the government's case, the defendants moved for a judgment of acquittal based on this same argument. The district court denied this motion as well.

**3.** As described in more detail later, *see infra* Part III.A.1–2, the definition of waste is governed by Colorado law because Colorado has implemented a program that regulates haz-

ardous waste in lieu of the federal scheme. *See* 42 U.S.C. § 6926; Colo.Rev.Stat. §§ 25–15–301 to –328; *Colo. Dep't of Pub. Health & Env't. v. United States*, 693 F.3d 1214, 1216 (10th Cir.2012). Colorado's program is nonetheless enforceable by federal authorities. *See United States v. Power Eng'g Co.*, 303 F.3d 1232, 1236–40 (10th Cir.2002).

measures to prevent Executive's employees from breaking CRTs while packing them for export. The district court sustained the government's hearsay objection to these e-mails, but allowed Mr. Olson to testify about their content.

Second, the defendants challenged the government's allegation that Executive's shipment of intact CRTs also violated the relevant environmental laws. According to the defendants, these CRTs could not constitute waste, even under the government's definition, because they were sold for reuse in new television monitors, which is a use consistent with the CRTs' original intended purpose. In rebuttal, the government offered testimony from Edward Smith, an employee of the Department, who claimed a CRT re-housed in another monitor is waste because the reuse requires "processing."

Following trial, the jury returned verdicts against Mr. Richter and Mr. Olson on six counts of wire fraud, one count of mail fraud, and one count of smuggling.[4] It also found Mr. Richter guilty of obstructing justice based on his response to the EPA's request for documents. The district court sentenced Mr. Richter to thirty months' imprisonment, three years' supervised release, and ordered him to pay $70,144 in restitution. The court sentenced Mr. Olson to fourteen months' imprisonment, three years' supervised release, and ordered him to pay $17,536 in restitution. The defendants filed this timely appeal.

### III. DISCUSSION

Mr. Richter and Mr. Olson raise several challenges to their convictions.[5] First, they ask us to reverse their convictions for smuggling because the jury instruction defining waste was incorrect as a matter of law and violated their due process right to fair notice of criminal prohibitions. Regarding the mail and wire fraud convictions, Mr. Richter and Mr. Olson argue, as they did before the district court, that their customers were not deprived of money or property. They also assert the district court committed evidentiary errors and that these errors were so prejudicial that a new trial is warranted on all charges, including Mr. Richter's obstruction of justice conviction.

To resolve these issues, we first consider whether the district court correctly instructed the jury on the definition of waste under Colorado law. Our analysis of this question begins, as it must, with the relevant statutory framework, and then considers the impact of any valid regulations. Next, we interpret the relevant regulation, taking into account the legislative history, the consequences of the parties' suggested constructions, and the ends to be achieved by the regulation. Ultimately, we conclude the regulation is ambiguous and that Colorado courts would interpret the regulation in a manner consistent with the waste jury instruction, even in the absence of the Guidance Document. We therefore do not determine the level of deference, if any, appropriate to the Department's informal Guidance Document in this criminal enforcement action.

Having thus resolved the ambiguity in the regulation, we reject the defendants' argument that the rule of lenity dictates a

---

4. Mr. Richter and Mr. Olson were acquitted of directly violating RCRA by exporting hazardous waste without filing the proper notices of intent to export.

5. Although Mr. Richter and Mr. Olson have submitted separate briefs in this matter, raising separate arguments, they have each joined in the other's brief. We therefore consider all issues with respect to both defendants, unless otherwise indicated.

contrary interpretation. Instead, we hold the Waste Instruction is a correct statement of Colorado law. We further conclude the defendants here had fair notice that, under Colorado law, electronic components become waste unless they are resold, donated, repaired, or refurbished for their original intended purpose. Accordingly, we reject their federal due process argument.

Next, we address the defendants' argument that their convictions for mail and wire fraud must be reversed because Executive's customers were not deprived of money or services. We hold that the evidence taken in the light most favorable to the verdict supports the jury's finding of each of the elements of mail and wire fraud. But we agree with the defendants that the district court erred in permitting Mr. Smith to provide a bare legal conclusion without providing a basis for his opinion. We are convinced the defendants were substantially prejudiced by Mr. Smith's testimony. As a result, we reverse the defendants' convictions for smuggling, mail fraud, and wire fraud. Finally, we consider Mr. Richter's challenge to his conviction for obstruction of justice. We conclude the evidence of guilt is sufficiently strong that the impact of Mr. Smith's testimony does not undermine our confidence in the verdict. Consequently, we uphold that conviction.

### A. The Validity of the Smuggling Conviction

We turn first to the defendants' smuggling conviction. The defendants were charged with, and convicted of, smuggling in violation of 18 U.S.C. § 554. Section 554(a) prescribes criminal penalties for fraudulently or knowingly exporting, attempting to export, or facilitating the

transportation, concealment, or sale of "any merchandise, article, or object contrary to any law or regulation of the United States." The indictment alleges that defendants violated § 554 by facilitating the exportation of the CRTs contrary to RCRA, in particular 42 U.S.C. § 6928(d)(4) and (d)(6), which impose restrictions on the exportation of hazardous waste. The defendants' primary challenge is that the jury instruction defining waste for purposes of Colorado's regulatory scheme was erroneous and that, even if the instruction was correct, they lacked fair notice that this definition might be criminally enforced against them. Thus, the validity of the defendants' convictions for smuggling turns on whether the exportation of the CRTs in this case violated the requirements for the lawful exportation of hazardous waste. Accordingly, we begin our analysis of this issue by describing the applicable hazardous waste management framework, which is governed by RCRA and corresponding Colorado law. We then explain how the district court arrived at its waste instruction and proceed to address the defendants' challenges.

### 1. The Pertinent Legal Framework and the District Court's Jury Instruction

"RCRA is a comprehensive statute designed to reduce or eliminate the generation of hazardous waste and 'to minimize the present and future threat to human health and the environment' created by hazardous waste." *Crandall v. City & Cnty. of Denver, Colo.,* 594 F.3d 1231, 1233 (10th Cir.2010) (quoting 42 U.S.C. § 6902(b)). The statute "empowers EPA to regulate hazardous wastes from cradle to grave, in accordance with [RCRA's] rigorous safeguards and waste management procedures." *City of Chicago v. Envtl. Def. Fund,* 511 U.S. 328, 331, 114 S.Ct.

1588, 128 L.Ed.2d 302 (1994). It imposes criminal penalties against a person who, among other things, knowingly exports "any hazardous waste" and "fails to file any record, application, manifest, report, or other document required to be maintained or filed," or knowingly exports "a hazardous waste" "without the consent of the receiving country" or in violation of an international agreement governing the export of hazardous waste. 42 U.S.C. § 6928(d)(4), (6). Thus, as is relevant here, RCRA makes it a crime to export hazardous waste without filing the proper notification of intent to export with the EPA or without the consent of the receiving country.

Although RCRA establishes a federal regulatory scheme for hazardous waste, it authorizes the EPA Administrator to approve state hazardous waste programs to operate "in lieu of" the federal scheme. 42 U.S.C. § 6926(b); *see U.S. Dep't of Energy v. Ohio,* 503 U.S. 607, 611, 112 S.Ct. 1627, 118 L.Ed.2d 255 (1992). But federal law sets a floor for state hazardous waste programs, and the Administrator can authorize a state program only if it is both "consistent with" and "equivalent to" the federal program. 42 U.S.C. § 6926(b). Thus, although states are free to impose requirements that "are more stringent than those imposed by" RCRA and its regulations, they may not impose standards less stringent than those federal standards. *Id.* § 6929.

■■▌ When a state program is authorized under RCRA, federal regulations are displaced or supplanted by state regulations. *See U.S. Dep't of Energy v. Ohio,* 503 U.S. 607, 611, 112 S.Ct. 1627, 118 L.Ed.2d 255 (1992). But EPA retains the power under RCRA to pursue civil and criminal remedies for violations of the state program. *See United States v. Power Eng'g Co.,* 303 F.3d 1232, 1236–40 (10th Cir.2002).

Consistent with RCRA's delegation of authority to the states, Colorado administers its own program, the Colorado Hazardous Waste Management Act (the Act). *See* Colo.Rev.Stat. §§ 25–15–301 to –328; *Colo. Dep't of Pub. Health & Env't v. United States,* 693 F.3d 1214, 1216 (10th Cir.2012). The Act's Solid Waste regulations generally mirror those of the federal scheme. *Compare* 6 Colo.Code Regs. § 1007–3:261.2, *with* 40 C.F.R. § 261.2. Under the Act, as under RCRA, a material can be classified as a hazardous waste only if it is first classified as a waste. *See* 6 Colo.Code Regs. §§ 1007–3:261.2, 261.3. But the Act differs from the federal scheme in certain respects. For example, the federal program contains rules that expressly govern broken and used CRTs. *See* 40 C.F.R. §§ 261.39, 261.40. Colorado, on the other hand, has not adopted the federal CRT rules and instead regulates the disposal of electronic devices and components, including CRTs, under its universal waste regulations. *See, e.g.,* 6 Colo. Code Regs. §§ 1007–3:261.9(a)(6), 273.1(a).

Part 273.2(f)(3) of Colorado's waste regulations establish four ways by which an electronic device or component becomes a "waste":

(i) A used electronic device destined for disposal becomes a waste on the date it is discarded.

(ii) A used electronic device destined for recycling becomes a waste on the date the recycler 'determines that the device cannot be resold, donated, repaired, or refurbished, or determines that he/she cannot directly reuse or sell useable parts from the device.

(iii) An electronic component becomes a waste on the date the recycler determines that the component cannot be resold, donated, repaired, or refurbished, or determines that he/she cannot directly reuse the component.

(iv) An unused electronic device becomes a waste on the date the handler decides to discard it.

*Id.* § 1007–3:273.2(f)(3) (hereinafter Part 273.2(f)(3)). Notably, under subsections (ii) and (iii) of this provision, the "waste" classification turns on whether the device or component can be "resold, donated, repaired, or refurbished," or whether a recycler "cannot directly reuse or sell useable parts from the device" or otherwise "directly reuse the component."

In March 2004, the Department issued a memorandum, made available on its website, clarifying "the hazardous waste regulations as they pertain to electronic waste recycling service providers doing business in Colorado." 2 R. at 176–79, *available at* https://www.colorado.gov/pacific/sites/default/files/HM_ewaste-recycler-interpretive-guide.pdf (last visited June 14, 2015) (the Guidance Document). This Guidance Document specifically addressed how electronic waste recyclers should distinguish regulated "waste" from a "product"—such as an electronic device offered for resale—explaining:

> The definition of "product" also needs to be clarified. *For post-consumer electronic devices or components to be considered products, they must have reuse and/or resale value for their original intended purpose.* Examples include a computer monitor that is resold for continued use as a monitor, a computer CPU that is refurbished for continued use as a computer, *or a computer chip that can be removed from one CPU and used to repair another for continued use as a computer.*

*Id.* at 177 (emphasis added).

The district court included language from this Guidance Document in the Waste Jury Instruction, which stated, with our emphasis:

> Electronic devices and electronic components can become a "waste" in four ways:
>
> (1) A used electronic device destined for disposal becomes a waste on the date it is discarded;
>
> (2) A used electronic device destined for recycling becomes a waste on the date the recycler determines that the device cannot be resold, donated, repaired or refurbished, or determines that he cannot directly reuse or sell useable parts from the device.
>
> (3) An electronic component becomes a waste on the date the recycler determines that the component cannot be resold, donated, repaired, or refurbished, or determines that he cannot directly reuse the component.
>
> (4) An unused electronic device becomes a waste on the date the handler decides to discard it.
>
> For subparts (2) and (3) above, *in order for an electronic device or electronic component to not be a waste, it must be resold, donated, repaired, reused or refurbished for its original intended purpose.* For example, the following would not be considered a waste: (1) a computer monitor that is resold for continued use as a monitor, (2) a computer CPU that is refurbished for continued use as a computer, or (3) *a computer chip that can be removed from one CPU and used to repair another for continued use as a computer.*

2 R. at 427–28 (the Waste Instruction).

On appeal, Mr. Richter and Mr. Olson challenge the correctness of the district

court's inclusion of the "original intended purpose" requirement in the jury instruction defining hazardous waste. First, they argue the district court improperly deferred to the Department's interpretation of the waste regulation contained in the Guidance Document and that alternatively, even if deference were otherwise appropriate, the Department's interpretation of the regulation is not reasonable. Relatedly, they claim the rule of lenity prohibits interpreting the regulation to include an original intended purpose requirement. Next, the defendants assert that if the regulation is interpreted to include an original intended purpose requirement, thereby subjecting them to criminal liability for exporting CRTs to purchasers overseas, it violates their due process rights to fair notice under the U.S. Constitution. We address each issue in turn.

### 2. The Accuracy of the Waste Instruction

"We review de novo the jury instructions as a whole and view them in the context of the entire trial to determine if they accurately state the governing law and provide the jury with an accurate understanding of the relevant legal standards and factual issues in the case." *United States v. Bedford*, 536 F.3d 1148, 1152 (10th Cir.2008) (internal quotation marks omitted). We review the district court's phrasing of a particular jury instruction for abuse of discretion. *United States v. Thomas*, 749 F.3d 1302, 1312–13 (10th Cir. 2014). As the defendants have challenged the substance of the Waste Instruction, we review this issue de novo.

Because Colorado administers its own hazardous waste program under RCRA, we apply Colorado law to ascertain the meaning of waste. Colorado, like RCRA, does not define waste by statute, so we look to Part 273.2(f)(3) of Colorado's waste regulations for a definition of this term. In construing a regulation, Colorado courts "apply those basic rules of interpretation which pertain to the construction of a statute." *Regular Route Common Carrier Conference of Colo. Motor Carriers Ass'n v. Pub. Util. Comm'n*, 761 P.2d 737, 745 (Colo.1988). The primary goal of interpretation is to "give effect to the intent of the enacting body." *Benuishis v. Indus. Claim· Appeals Office*, 195 P.3d 1142, 1145 (Colo.App.2008).[6] Thus, Colorado courts "first look at the plain language of the regulation and interpret its terms in accordance with their commonly accepted meanings." *Id.* The courts "read the provisions of a regulation together, interpreting the regulation as a whole." *Schlapp ex rel. Schlapp v. Colo. Dep't of Health Care Policy & Fin.*, 284 P.3d 177, 180 (Colo.App.2012). If a regulation's language is unambiguous, Colorado courts "give effect to the plain and ordinary meaning of the section without resorting to other rules of statutory construction." *Gessler v. Colo. Common Cause*, 327 P.3d 232, 237 (Colo.2014) (internal quotation marks omitted). Language is ambiguous when it is susceptible to multiple valid interpretations. *A.M. v. A.C.*, 296 P.3d 1026, 1030 (Colo.2013).

#### a. Plain Language

Part 273.2(f)(3)'s definition of waste is ambiguous because it is susceptible to multiple valid interpretations. *See A.M.*, 296 P.3d at 1030. Recall that the regula-

**6.** In applying Colorado law, the opinions of the Colorado Court of Appeals are highly persuasive, though not binding. *See Martin K.*

·*Eby Constr. Co. v. OneBeacon Ins. Co.*, 777 F.3d 1132, 1139 (10th Cir.2015).

tion provides that electronic devices and components are not waste so long as they can be "resold," "donated," "repaired," "refurbished," or "reuse[d]." Part 273.2(f)(3). The defendants have offered one permissible reading of the regulation. They argue that Part 273.2(f)(3) does not expressly include an original intended purpose requirement, and that the words "resold," "donated," "refurbished," and "reused" likewise do not mandate such a requirement. Thus, they interpret Part 273.2(f)(3) to mean that an electronic device or component that can be resold, donated, repaired, refurbished, or reused for any purpose is not waste.

Although the defendants' reading of the regulation may be permissible, the regulation can also be reasonably interpreted to include an original intended purpose requirement. Indeed, two of the words, "repair" and "refurbish," lend themselves most naturally to an interpretation that an item will retain its originally intended purpose. *See, e.g., Webster's Third New International Dictionary* 1923 (2002) (defining "repair" as "*to restore* by replacing a part or putting together what is torn or broken" (emphasis added)); *id.* at 1910 (defining "refurbish" as "to make as if new"); *see also In re Mallo,* 774 F.3d 1313, 1321 (10th Cir.2014) (recognizing that we interpret words using their ordinary and common meanings). And there is nothing about any of the other three words, "resold," "donated," and "reused," that excludes an original intended purpose requirement. *See, e.g., Webster's* at 672 (defining "donate" as "to make a free gift or a grant of"); *id.* at 1942 (defining "reuse" as "to use again"). Therefore these terms could also plausibly be read to carry a similar meaning. *See Gustafson v. Alloyd Co.,* 513 U.S. 561, 575, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995) ("[A] word is

known by the company it keeps."); *Young v. Brighton Sch. Dist. 27J,* 325 P.3d 571, 579 (Colo.2014). Thus, the interpretation adopted by the Department's Guidance Document that electronic devices and components are not waste so long as they can be resold, donated, repaired, refurbished, or reused for their original intended purpose is a second permissible reading of the regulation. Because the regulation here is susceptible to at least two valid interpretations, it is ambiguous. *See also People v. Disher,* 224 P.3d 254, 256–57 (Colo.2010) (holding that, where a statute's definition of "intimate relationship" was silent on whether a sexual relationship was required and some of the examples included in the definition implied a sexual relationship but some did not, it was ambiguous and the court was required to look beyond its text to resolve that ambiguity); *People v. Madden,* 111 P.3d 452, 458–59 (Colo.2005) (holding that statute defining "prostitution of a child" as inducing a child to perform sex acts "through the use of coercion, threat, or intimidation or in exchange for money" can "reasonably be construed in two different ways, one which does not require a commercial transaction and one that does," and turning to the legislative history for guidance). *But see Tebbetts v. Whitson,* 956 P.2d 639, 641–42 (Colo.App. 1997) (holding that where a regulation could not fairly be read to have spoken at all on an issue, an agency's proposed interpretation of the regulation as it pertained to that issue was not a reasonable interpretation of the regulation). Therefore, we apply Colorado's normal tools of statutory construction to discern Part 273.2(f)(3)'s proper meaning.

### b. *Regulatory Context and Purpose*

To resolve ambiguities, Colorado courts attempt to effectuate the underlying

purpose of a regulatory scheme and, to that end, "may rely·on other factors such as legislative history, the consequences of a given construction, and the end to be achieved by the statute." *See People v. Yascavage,* 101 P.3d 1090, 1093 (Colo. 2004). Considering the legislative purpose of the adoption of Colorado's waste management program generally, and the Department's responsibility to administer it consistently with that intent, the meaning of Part 273.2(f)(3) is apparent.

■ The Colorado General Assembly adopted the Act to "[e]stablish[ ] a state program of comprehensive regulation of hazardous waste management in lieu of the federal program" under RCRA. S.B. 519, 53rd Gen. Assembly, 1st Reg. Sess. (Colo. 1981); *see also* Colo.Rev.Stat. §§ 25–15–301, –301.5. The General Assembly then charged the Department with the responsibility to administer that program, and authorized the Department to promulgate the regulations necessary to operate it in lieu of the federal program. Colo.Rev. Stat. § 25–15–302(2). To realize the General Assembly's intent, the state program had to be at least as protective of the environment as the federal RCRA regulations. *See* 42 U.S.C. § 6926(b) (authorizing state programs so long as they are "equivalent to" and "consistent with" RCRA's regulations); *id.* § 6929 ("[N]o state ... may impose any requirements less stringent than those authorized" by RCRA). The General Assembly expressly recognized this limitation and, by statute, ordered the Department to implement its hazardous waste control program in a manner that "[m]aintains program authorization by the federal government." Colo. Rev.Stat. § 25–15–301.5(1)(a).

RCRA and its implementing regulations define hazardous wastes to include poten-tially toxic solid waste. *See* 42 U.S.C. § 6903(5); 40 C.F.R. §§ 261.3(a), 261.20(a), 261.24. And, subject to exceptions not relevant here, solid waste under federal law includes spent material that "has been used and as a result of contamination can no longer serve the purpose for which it was produced without processing." 40 C.F.R. § 261.1(c)(1) (defining spent material); *see* 40 C.F.R. § 261.2(c) (defining solid waste). Thus, under RCRA, used electronic devices and components become waste when they can no longer be used for their original intended purpose. Colorado was therefore required to adopt a definition of waste at least as protective as the federal rule—one that requires the device or component to be classified as waste unless it can be resold, donated, repaired, refurbished, or reused for its original intended purpose.

The defendants' contrary interpretation would create a defect in Colorado's hazardous waste program by permitting conduct (here, resale, donation, repair, refurbishment, or reuse of electronic devices and components for *any* purpose) that falls below the environmental protections mandated by federal law. Because Colorado's hazardous waste program must be "consistent with" and "equivalent to" the federal program, such a defect would mean Colorado's program could no longer be authorized by the EPA. That outcome is contrary to the General Assembly's express goal and direction to the Department. Although there are two plausible readings of Part 273.2(f)(3), only the reading that classifies an electronic device as waste when it can no longer be resold, donated, repaired, refurbished, or reused for its original intended purpose "effectuate[s] the underlying purpose of [the] regulatory scheme," is consistent with the legislative history of the Act, and results in a construction that

facilitates "the end to be achieved by the statute." *See Yascavage*, 101 P.3d at 1093. Accordingly, we hold that Colorado would define waste consistently with the district court's instruction to the jury.[7]

### c. The Rule of Lenity

 The defendants alternatively argue that this definition of waste, whether arrived at by deference to the Department's interpretation or otherwise, is prohibited by the rule of lenity. Under this tool of interpretation, courts must interpret an ambiguous law in favor of a criminal defendant. *People v. Lowe*, 660 P.2d 1261, 1267 (Colo.1983), *abrogated on other grounds by Callis v. People*, 692 P.2d 1045, 1052 (Colo.1984). But the rule of lenity is a rule of last resort that we apply only if ambiguity remains after we have exhausted all other tools of interpretation. *See People v. Thoro Prods. Co.*, 70 P.3d 1188, 1195–98 (Colo.2003) (attempting to ascertain the meaning of a provision of the Colorado Hazardous Waste Management Act by turning to legislative history and harmonizing the provision with relevant federal laws before applying the rule of lenity); *see also United States v. Rentz*, 777 F.3d 1105, 1113 (10th Cir.2015) (en banc) (recognizing that the rule of lenity applies only after courts exhaust all other evidence of congressional meaning). Here, our application of Colorado rules of construction resolved any ambiguity in the

meaning of the regulation. Because the regulation has a single discernable meaning, the rule of lenity compels no alternative interpretation.

For these reasons, we hold that under Colorado law, an electronic device or component becomes waste unless it is resold, donated, repaired, refurbished, or reused for its original intended purpose. Accordingly, the Waste Instruction was a correct statement of the applicable law.[8]

### 3. Fair Notice

 Having concluded that the Waste Instruction was correct, we must still determine whether the defendants' federal due process rights have been violated because they did not have fair notice of the original intended purpose requirement. Under the particular facts present here, we are convinced the defendants had fair notice.

 To comport with the Due Process Clause of the U.S. Constitution, a law must "give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute." *United States v. Lovern*, 590 F.3d 1095, 1103 (10th Cir.2009) (internal quotation marks omitted). This notice must be given "in a manner that does not encourage arbitrary and discriminatory enforcement." *Skilling v. United States*, 561 U.S. 358, 402–03, 130 S.Ct. 2896, 177 L.Ed.2d

---

7. The parties dispute the degree of deference owed to the Guidance Document. But we conclude that Colorado courts would construe Part 273.2(f)(3) to include an original intended purpose requirement, without reference to the Guidance Document. Thus, we need not determine the degree of deference, if any, Colorado courts would afford an agency's informal interpretation of a regulation that can be enforced in a criminal action.

8. Because we affirm the Waste Instruction based on a construction of Part 273.2(f)(2), we do not consider the government's alternative argument that electronic devices and components are simultaneously regulated by Colorado's solid waste regulations and the state's universal waste regulations. Aplee. Br. 37 n. 9; *see also* 6 Colo.Code Regs. §§ 1007–3:261.1, 261.9(a)(6), 273.1(b).

619 (2010). However, "if the statutory prohibition involves conduct of a select group of persons having specialized knowledge ... the standard is lowered and a court may uphold a statute which uses words or phrases having a technical or other special meaning, well enough known to enable those within its reach to correctly apply them." *United States v. Elias,* 269 F.3d 1003, 1014 (9th Cir.2001) (internal quotation marks omitted). This is because where a statute or regulation is aimed at a class of people with specialized knowledge, the specificity required by due process is measured by the common understanding of that group. *See Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498–99, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982).

■ Viewing the case under this lens, we are satisfied the defendants had the fair notice required by the Constitution. Importantly, Part 273.2(f)(3) alone provided the defendants with sufficient fair notice. To ensure a defendant has fair notice, the Constitution prohibits an "unforeseeable and retroactive judicial expansion" of criminal liability. *Bouie v. City of Columbia,* 378 U.S. 347, 352, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964). But the Constitution permits courts to interpret ambiguous statutes and regulations. *See United States v. Lanier,* 520 U.S. 259, 266, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (explaining that "clarity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute"); *United States v. Waseta,* 647 F.3d 980, 985 (10th Cir.2011) (restricting "due process limitations on the retroactive application of judicial interpretations of criminal statutes to those that are *unexpected and indefensible* by reference to the law which had been expressed prior

to the conduct at issue" (emphasis added) (citations and internal quotation marks omitted)); *United States v. Welch,* 327 F.3d 1081, 1093–1100 (10th Cir.2003) ("[T]he touchstone for due process is whether [a criminal statute or regulation], either standing alone or *as construed,* made it reasonably clear at the relevant time that [the defendants'] conduct was criminal." (emphasis added) (citations and internal quotation marks omitted)).

■ In determining whether a judicial interpretation is sufficiently foreseeable to merit application to a criminal defendant where that interpretation has not been given effect by a prior court decision, the starting point of our analysis "is the statutory language at issue, its legislative history, and judicial constructions of the statute." *Webster v. Woodford,* 369 F.3d 1062, 1069–70 (9th Cir.2004). A construction of Part 273.2(f)(2) that takes into account the regulation's text, the surrounding statutory scheme, and indicia of legislative intent was reasonably foreseeable. As explained above, the application of traditional tools of interpretation dictates an interpretation of the regulation consistent with the Waste Instruction. That alone is enough to demonstrate the regulation provided defendants with the fair notice required by the Due Process Clause. *See Rose v. Locke,* 423 U.S. 48, 49–50, 96 S.Ct. 243, 46 L.Ed.2d 185 (1975) (explaining that statutes which require interpretation using standard tools of legal analysis are not unconstitutionally vague); *United States v. Councilman,* 418 F.3d 67, 82–85 (1st Cir. 2005) (rejecting a defendant's fair notice challenges after interpreting a criminal statute in light of its legislative history).

Looking beyond the language of Part 273.2(f)(3) and the legislative purpose of

the relevant statute, the record here reflects other considerations that demonstrate the defendants had fair notice. Mr. Richter and Mr. Olson were members of a specialized and technical field: electronic waste recyclers operating in Colorado. Because this is a highly regulated industry, it is fair to charge defendants with awareness that Colorado's waste program had to be at least as stringent as EPA's RCRA regulations, and that the federal regulations included the original intended purpose requirement. *See* 42 U.S.C. § 6926(b); 40 C.F.R. §§ 261.1, 261.2, 261.20. Thus, the defendants were on notice that an interpretation harmonizing the two regulatory schemes was reasonable, and indeed likely to be enforced against them. *Cf. United States v. Weitzenhoff,* 35 F.3d 1275, 1289 (9th Cir.1993) (holding that knowledgeable wastewater management professionals can be expected to understand the meaning of a disposal permit, particularly in light of the context of the EPA's scheme for regulating wastewater).

Charging the defendants with notice in this case is particularly fair because the record establishes they, as required by their business model, kept abreast of developments in hazardous waste regulation and had actual notice of the Department's interpretation. Mr. Richter founded Executive in response to changes he observed in Colorado's universal waste regulations, and while Mr. Richter and Mr. Olson worked at Executive, the company participated in a generator assistance program through which the Department provided information to assist Executive with understanding and complying with those universal waste regulations. The Department

provided electronic waste recyclers like the defendants with clear and unambiguous notice that it interpreted Part 273.2(f)(3)'s definition of waste to include the original intended purpose provision when it published the Guidance Document in 2004, well before this enforcement action. *Compare United States v. Norris,* 39 Fed.Appx. 361, 364 (7th Cir.2002) (unpublished) (holding that an agency form that defined the level of disclosure required under a regulation was enforceable against a criminal defendant where it "plainly and consistently" notified defendants of the law's specific requirements),[9] *with Carter v. Welles–Bowen Realty, Inc.,* 736 F.3d 722, 727 (6th Cir.2013) (holding that a guidance document is not binding where it provided only a list of factors the agency would consider rather than a clear statement of policy).

The government's search of Executive's offices discovered a copy of the Guidance Document, and the defendants do not dispute that they had actual knowledge of its contents. Actual notice of an agency's interpretation—even an interpretation that lacks the force and effect of law—can meet the demands of fair notice. *See United States v. Ventura–Melendez,* 321 F.3d 230, 233–34 (1st Cir.2003) (concluding actual notice of a promulgated regulation that had not yet been published in the Federal Register—and hence was not yet binding and did not yet have the force of law—was sufficient to show that "defendants' convictions did not violate the Due Process or Ex Post Facto Clauses"); *cf. United States v. Davis,* 339 F.3d 1223, 1227–28 (10th Cir. 2003) (ruling that a criminal defendant's actual notice of a regulation was sufficient

---

9. Although not precedential, we find the reasoning of unpublished opinions instructive. *See* 10th Cir. R. 32.1 ("Unpublished opinions are not precedential, but may be cited for their persuasive value."); *see also* Fed. R.App. P. 32.1.

to satisfy a statutory requirement that the regulation be conspicuously posted because actual notice satisfied the fair notice purpose of the posting requirement and explaining that this ruling is consistent with "related cases holding that a party can be held criminally liable under an unpublished regulation where the party had actual knowledge of its terms"). Thus, the Department's Guidance Document provided the defendants with fair notice that this definition of waste would be enforced against them. *See, e.g., Elias,* 269 F.3d at 1014–15 (holding that industry groups' and various agencies' conclusions that certain cyanide-containing wastes were hazardous provided fair notice to support criminal conviction under RCRA, despite the defendant's claim that the regulation required a specific standards-based test).

For all of these reasons, we hold the defendants had fair notice that an electronic device becomes waste when it can no longer be resold, donated, repaired, refurbished, or reused for its original intended purpose, and therefore the jury instruction incorporating that definition did not violate the defendants' federal due process rights. Although we conclude the jury instruction was correct and reject the defendants' fair notice argument, as explained below, *infra* Part III.C.1, we ultimately reverse the smuggling and fraud convictions based on the prejudicial testimony of Mr. Smith.

### B. The Validity of the Mail and Wire Fraud Convictions

 Mr. Richter and Mr. Olson were also convicted of mail and wire fraud. The defendants contend the indictment did not allege, and the government did not prove, a deprivation of money or property as required by both federal fraud statutes.[10] We review the sufficiency of the indictment, the district court's interpretation of the mail and wire fraud statutes, and the denial of a motion for judgment of acquittal de novo. *See United States v. Porter,* 745 F.3d 1035, 1050 (10th Cir.2014); *United States v. Ambort,* 405 F.3d 1109, 1116 (10th Cir.2005).

 The mail and wire fraud statutes require the government to prove the following elements beyond a reasonable doubt: (1) a scheme or artifice to defraud or obtain money or property by false or fraudulent pretenses, representations, or promises; (2) an intent to defraud; and (3) use of the mails (§ 1341) or interstate wires (§ 1343) in connection with the scheme. *See Porter,* 745 F.3d at 1050–51. The defendants claim the government failed to plead or prove the first of these elements.

The government claims the defendants fraudulently obtained both money and property by means of their various misrepresentations. Recall that the government's fraud case was predicated on three alleged misrepresentations: (1) that electronic devices would be disposed of in compliance with all local, state, and federal laws and regulations; (2) that these items would be disposed of domestically and not shipped overseas; and (3) that these items would be completely destroyed in an environmentally safe manner. The heart of the government's fraud case is that Executive's customers, relying on such representations, paid the defendants to dispose of

---

**10.** The defendants also claim that errors in the Waste Instruction tainted their mail and wire fraud convictions. Because we have concluded that the Waste Instruction was correct, we reject this claim.

their e-waste in a particular way—lawfully, domestically, and completely—but did not get the benefit of that bargain because Executive unlawfully exported e-waste. According to the government, the defendants fraudulently obtained money and the customers' property in the form of the used electronic devices as a result of false representations.

The defendants counter that although the indictment uses language of "money" and "property," the scheme alleged did not actually involve a deprivation of either. Rather, the defendants contend the "true thrust" of the government's allegation is that Executive's customers' "expectations were disappointed, ... their environmental sensibilities were frustrated, and ... their aversion to the environmental risk of improper downstream disposal was violated as a result of an undisclosed deviation in how these items were handled and disposed of after title, custody, and control was transferred to [Executive]." This, they contend, is not a cognizable claim under the mail and wire fraud statutes.

In other words, the defendants argue the scheme could not involve a deprivation of money because the e-waste removal services that were paid for were actually performed. That the services were not performed in a particular way is of no consequence according to the defendants: "[Executive]'s customers did not pay for a particular type of disposal; they may have expected it; they may have been assured of it; but they did not pay, cover, carry, or otherwise incur any of the costs associated with domestic disposal."

The defendants further assert that there can be no deprivation of property because the used electronic devices had no value when in the hands of Executive's customers. Rather than alleging the deprivation of a tangible, protectable property interest, the defendants contend the government's theory merely alleges the deprivation of an intangible property interest—the right to control the ultimate disposition of property (an "alienation" theory). Citing cases from the Ninth and Second Circuits, the defendants argue that the right to control the downstream disposition of property is not a cognizable property interest under the federal fraud statutes. *See United States v. Bruchhausen,* 977 F.2d 464 (9th Cir.1992); *United States v. Evans,* 844 F.2d 36 (2d Cir.1988).

 We are convinced the evidence supports the defendants' mail and wire fraud convictions. Executive's customers paid to have their e-waste disposed in accordance with the defendants' factual representations, which were material to the customers' decisions. A reasonable trier of fact could conclude the customers were induced to pay for services under false pretenses: the pretense that their e-waste would be completely destroyed, in the United States, in a lawful and environmentally sound manner.

Under similar circumstances, the Fourth, Seventh, and Eighth Circuits have held that payments made in exchange for services provided under a contract induced by false representations, even where the services are performed, constitute a deprivation of money or property sufficient to invoke the federal fraud statutes. *See United States v. Leahy,* 464 F.3d 773 (7th Cir.2006); *United States v. Bunn,* 26 Fed. Appx. 139 (4th Cir.2001) (unpublished); *United States v. Granberry,* 908 F.2d 278 (8th Cir.1990); *see also United States v. Paccione,* 949 F.2d 1183 (2d Cir.1991).

In *Granberry,* the defendant lied about his status as a convicted felon to obtain a

school bus operator's permit. 908 F.2d at 279. He lied again about that status when he applied for a job as a bus driver with a certain school district. The government prosecuted the defendant for mail fraud. *Id.* at 279. As in this case, the defendant argued he had deprived the school district of neither money nor property because the district got what it paid for: a licensed bus driver who drove students to and from school. *Id.* at 280. And the defendant noted the school district would have paid as much to another driver performing the same job. Rejecting these arguments, the Eighth Circuit held:

> What the School District wanted was a competent school-bus driver who was truthful and had not been convicted of a felony, and this is not what it got. The School District has been deprived of money in the very elementary sense that its money has gone to a person who would not have received it if all of the facts had been known.

*Id.* at 280. The court concluded the school district had been deprived of its property, too, because it had a choice in how to spend its money and the defendant's misrepresentations induced it to part with that money under false pretenses. *Id.;* *see also Bunn,* 26 Fed.Appx. at 142 (holding that where defendant made false representations to attain government contract, but performed satisfactorily, the government had been deprived of money or property for purposes of mail and wire fraud); *Leahy,* 464 F.3d at 787 (same).

The defendants cite two cases in support of their view that an alleged victim has no cognizable property interest in the disposition of property to which it no longer has title. The first of these cases, *United States v. Evans,* does little to help the defendants' cause. There, the Second Cir-

cuit held that the United States had no property interest—for purposes of the mail and wire fraud statutes—in the ultimate disposition of weapons manufactured in the United States. *Evans,* 844 F.2d at 40–42. It was undisputed, however, that the United States did not own and did not exchange money for any of the weapons. Here, Executive's customers released a valid property interest in the used electronic devices and paid money to Executive as a direct result of the misrepresentations.

In the other decision relied on by the defendants, *United States v. Bruchhausen,* the defendant and his associates lied to American technology manufacturers and the U.S. government about where the products being purchased would ultimately be sent. The defendant's lies were intended to conceal his scheme to smuggle U.S.-made technology to Soviet bloc countries. In the defendant's fraud prosecution, the manufacturers testified they "would not have sold the products if they had been told that the products were destined for the Soviet bloc." *Bruchhausen,* 977 F.2d at 467.

The Ninth Circuit reversed the defendant's convictions, holding there was no protectable property interest at issue. It noted that "[t]he manufacturers received the full sale price for their products; they clearly suffered no monetary loss. While they may have been deceived into entering sales that they had the right to refuse, their actual loss was in control over the destination of their products." *Id.* at 467. Although the Ninth Circuit acknowledged that a "manufacturer may have an interest in assuring that its products are not ultimately shipped in violation of law" it concluded that such an "interest in the disposition of goods [a manufacturer] no longer

owns is not easily characterized as property." *Id.* at 468.

The Ninth Circuit's decision in *Bruchhausen* does not persuade us to reach a similar conclusion here.[11] This case does not involve a manufacturer's attempt to control the use of its product after sale to a third party. Instead, the customers hired Executive to provide services for the proper disposal of their waste. We agree with the Eighth Circuit that the customers have "been deprived of their money in the very elementary sense that [their] money has gone to [an entity that] would not have received it if all of the facts had been known." *Granberry,* 908 F.2d at 280.

Accordingly, we hold that the federal mail and wire fraud statutes are sufficiently broad in scope, *see Pasquantino v. United States,* 544 U.S. 349, 360, 372, 125 S.Ct. 1766, 161 L.Ed.2d 619 (2005), to cover those schemes designed to obtain payment for services by means of materially false and misleading pretenses.

### C. Evidentiary Issues

■ Having concluded that the jury instructions relevant to the smuggling charges were correct and that the defendants were properly charged with mail and wire fraud, we now address the propriety of the district court's evidentiary rulings. The defendants ask us to reverse their convictions for smuggling, wire fraud, and mail fraud, as well as Mr. Richter's conviction for obstructing justice, due to several

evidentiary rulings made by the district court. Ordinarily, a district court's decision to exclude evidence is reviewed for abuse of discretion. *United States v. Jones,* 768 F.3d 1096, 1103 (10th Cir.2014). Thus, we "will not disturb [its] ruling absent a distinct showing it was based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error of judgment." *United States v. Watson,* 766 F.3d 1219, 1234 (10th Cir. 2014).

■ Over the defendants' objections, Mr. Smith was permitted to testify that CRTs that had been removed from their housing were waste because they could not again be used for their original intended purpose without processing. On appeal, the defendants argue the district court abused its discretion by admitting Mr. Smith's testimony because Mr. Smith was not proffered as an expert but provided expert testimony, and that in any event Mr. Smith exceeded the bounds of permissible testimony by infringing upon the province of the jury. They also claim this error was prejudicial. We agree.

Pursuant to Federal Rule of Evidence 701, "If a witness is not testifying as an expert," he may offer an opinion that is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Rule 702 governs expert testimony and

---

11. *Bruchhausen* involved two separate concurrences. The first, by Judge Kozinski, indicates agreement with both the lead opinion and the other concurring opinion. The second, by Judge Fernandez, takes issue with the lead opinion's statement "that a person has not been defrauded of his property when he is induced by fraudulent representations to transfer that property to another." *United States v. Bruchhausen,* 977 F.2d 464, 469 (9th Cir.1992) (Fernandez, J., concurring). We decline to weigh in on the dispute between Judge Canby and Judge Fernandez because we are not persuaded that *Bruchhausen* affects the outcome in this case.

allows for helpful testimony based on a witness's scientific, technical, or other specialized knowledge. Importantly, a party may not "evade the expert witness disclosure requirements ... by simply calling an expert witness in the guise of a layperson." Fed.R.Evid. 701 advisory committee's note.

The government did not attempt to qualify Mr. Smith as an expert. Nonetheless, Mr. Smith, in opining that CRTs become waste when they are removed from their housing and used to make another monitor, relied upon technical and specialized knowledge he garnered while monitoring the Department's Universal Waste Program, ensuring compliance with hazardous waste regulations, and assisting the Department's oversight of electronic devices and components. This opinion was improper expert testimony offered in the guise of lay testimony. *See United States v. Banks,* 262 Fed.Appx. 900, 905–08 (10th Cir.2008) (unpublished) (holding that a police officer's opinion that a defendant was "most definitely" engaged in drug dealing was not proper lay testimony because it was based on the officer's specialized training in narcotics and extensive experience in methamphetamine cases); *United States v. White,* 492 F.3d 380, 399–404 (6th Cir.2007) (holding that testimony about Medicare's structure, reimbursement and audit processes, and other Medicare concepts was expert testimony because it relied upon an understanding of the workings of "a complex and intricate regulatory scheme ... acquired over years of experience ... as well as [the witnesses'] understanding of various terms").[12]

Even if Mr. Smith had properly been qualified as an expert, this portion of his testimony was inadmissible. Federal Rule of Evidence 704 allows an expert witness to testify about an ultimate question of fact. But the rule does not permit an expert to instruct the jury how it should rule, if the expert does not provide any basis for that opinion. To be admissible, an expert's testimony must be helpful to the trier of fact. Fed.R.Evid. 702. To ensure testimony is helpful, "[a]n expert may not state legal conclusions drawn by applying the law to the facts, but an expert may refer to the law in expressing his or her opinion." *United States v. Bedford,* 536 F.3d 1148, 1158 (10th Cir.2008) (internal quotation marks and alterations omitted). "The line between a permissible opinion on an ultimate issue and an impermissible legal conclusion is not always easy to discern." *United States v. McIver,* 470 F.3d 550, 562 (4th Cir.2006). Permissible testimony provides the jury with the tools to evaluate an expert's ultimate conclusion and focuses on questions of fact that are amenable to the scientific, technical, or other specialized knowledge within the expert's field. *United States v. Dazey,* 403 F.3d 1147, 1171–72 (10th Cir.2005) ("Even if [an expert's] testimony arguably embraced the ultimate issue, such testimony is permissible as long as the expert's testimony assists, rather than supplants, the jury's judgment.").

As a result, "an expert may not simply tell the jury what result it should reach without providing any explanation of the criteria on which that opinion

---

12. The government's briefing on appeal appears to concede that Mr. Smith offered expert testimony. *See* Aplee. Br. at 48–49 (arguing that the appropriate standard of review for Mr. Smith's testimony is provided by *United States v. Dazey,* 403 F.3d 1147 (10th Cir.

2005), which reviewed the admission of expert testimony for abuse of discretion); *id.* at 49 ("The [district] court could have excluded or stricken Smith's statement as improper expert testimony.").

is based or any means by which the jury can exercise independent judgment." *Id.* at 1171. Expert testimony of this sort has been excluded alternatively "on the ground that it usurps the function of the jury in deciding the facts," or because it "interferes with the function of the judge in instructing the jury on the law." *Id.* at 1171 (internal quotation marks omitted). Witnesses are permitted to testify about how the law applies to a certain set of facts, so long as they provide adequate explanations for their conclusions. *Id.; see, e.g., United States v. Buchanan,* 787 F.2d 477, 483–84 (10th Cir.1986) (affirming admission of expert testimony that a homemade device was a firearm and therefore needed to be registered with the Bureau of Alcohol, Tobacco, and Firearms); *United States v. Logan,* 641 F.2d 860, 863 (10th Cir.1981) (an expert may testify about how certain funds were classified by law).[13]

Here, the government offered Mr. Smith's testimony regarding what constitutes waste under Colorado law in an effort to rebut Mr. Richter's testimony that the intact CRTs exported by Executive could be reused as television monitors and therefore were not waste. Specifically, Mr. Smith was asked whether it is "the original intended purpose if someone takes the CRT out of its housing and uses it to make another CRT." He answered, "No, it's not the original intended purpose. It has to be direct use or reuse without processing." But Mr. Smith did not provide a basis for his claim that processing alters the purpose for which a CRT is used or "provid[e] any explanation of the criteria on which [his] opinion [was] based or any means by which the jury [could] exercise independent judgment." *Dazey,* 403 F.3d at 1171. Rather than providing a useful explanation for the jury, Mr. Smith simply opined that "processing" somehow required that they find the CRTs are waste, even if the defendants exported them intact for reuse in monitors. And he did so without providing any explanation of what constitutes "processing" or how it impacts the original intended purpose requirement. *Cf. United States v. Schneider,* 704 F.3d 1287, 1294 (10th Cir.2013) (noting that while an expert may refer to the law in expressing an opinion, testimony raises concerns "when an expert uses a specialized legal term and usurps the jury's function"); *McIver,* 470 F.3d at 552 (expert testimony's overreliance on terms that "have a separate, distinct and specialized meaning in the law different from that present in the vernacular" risks crossing the line into unhelpful and inadmissible testimony (internal quotation marks omitted)). Thus, the district court erred, by permitting Mr. Smith to provide a bare legal conclusion without explaining the criteria he used to reach that conclusion.

 Because we agree with the defendants that the district court erred by admitting this portion of Mr. Smith's testimony, we must determine whether this error requires reversal of the defendants' convictions. "In order for an error of this

**13.** The rule gleaned from these decisions is summarized in the following illustration to Rule 704: an expert would not be permitted to tell a jury that a testator lacked capacity to make a will, but would be allowed to explain that a testator lacked the mental capacity to know the nature and extent of his property and the natural object of his bounty. Fed. R.Evid. 704 advisory committee's note; *see Specht v. Jensen,* 853 F.2d 805, 807–08 (10th Cir.1988) (en banc) (relying on Rule 704's advisory committee note in concluding that an expert witness exceeded the permissible bounds of expert testimony where he was permitted to broadly testify regarding his legal conclusions).

nature to be reversible, the error must affect substantial rights and must result in actual prejudice. Error which does not rise to the magnitude is harmless." *Evans ex rel. A.E. v. Indep. Sch. Dist. No. 25*, 936 F.2d 472, 476 (10th Cir.1991). "The question is not whether, omitting the inadmissible statements, the record contains sufficient evidence for a jury to convict the defendant." *United States v. Tome*, 61 F.3d 1446, 1455 (10th Cir.1995). Rather, reversal is appropriate where an error has a substantial influence on the outcome of a trial or leaves one in grave doubt as to whether it had such effect. *United States v. Medina–Copete*, 757 F.3d 1092, 1108 (10th Cir.2014).

In determining whether Mr. Smith's testimony had a substantial influence on the outcome of the trial, we find three factors relevant to this case: (1) the strength, importance, and pervasiveness of the erroneously admitted testimony; (2) the strength of the admissible evidence; and (3) whether the district court's instructions to the jury mitigated any error. *See, e.g., United States v. Turner*, 285 F.3d 909, 914–15 (10th Cir.2002) (holding that other evidence properly admitted at trial was "sufficiently strong" to permit the conclusion that the improper admission of unreliable expert testimony was harmless); *Tome*, 61 F.3d at 1455 (holding that the improper admission of evidence was prejudicial where the erroneously admitted evidence was "extremely compelling"); *Specht*, 853 F.2d at 808–09 (holding that the admission of expert testimony was prejudicial where the testimony was "pervasive"); *United States v. Sanders*, 928 F.2d 940, 942 (10th Cir.1991) (recognizing that a limiting instruction has the potential to cure any prejudice from the erroneous admission of evidence). Because the defendants claim Mr. Smith's testimony prej-

udiced them with respect to all of their convictions, we address the effect of the testimony on each in turn, beginning with the smuggling convictions.

## 1. The Impact of Mr. Smith's Testimony on the Smuggling Convictions

█ The government advanced two theories to prove the defendants were guilty of smuggling for exporting waste without authorization: first, that the defendants exported broken CRTs, and second, that the defendants sold CRTs for reuse in new monitors. Mr. Smith's evidence was critical to the government's second theory of guilt. Indeed, it was the only evidence that would support such a theory. *See Specht*, 853 F.2d at 808 (concluding that the admission of testimony was prejudicial where the expert was permitted to testify regarding an "array of legal conclusions touching upon nearly every element of the plaintiffs' burden of proof"); *cf. Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1214 (D.C.Cir.1997) (the presence of a larger body of unobjectionable testimony from which the jury could have drawn the same conclusions as the expert is relevant to prejudice). Further, in its closing argument, the government relied exclusively on Mr. Smith's statements to advance its theory that CRTs could not be reused in new monitors without becoming waste.

Compounding the prejudice, the government's use of Mr. Smith's testimony was simultaneously compelling and incorrect. *Cf. United States v. Messner*, 107 F.3d 1448, 1454–55 (10th Cir.1997) (concluding that any error in permitting an expert to state his view of the governing law was harmless where the view of the law was correct); *United States v. Arutunoff*, 1 F.3d 1112, 1118 (10th Cir.1993) (concluding

that the erroneous admission of an expert's misstatement of the law was harmless where the misstatement involved an issue not ultimately submitted to the jury). The defendants admitted they were in the business of selling CRTs for use in new monitors. The government offered Mr. Smith's testimony to assist the jury with understanding the complex regulatory scheme central to the charges against the defendants. Rather than explaining how the facts should be applied to the relevant law, Mr. Smith told the jury the defendants had violated the law when they exported intact CRTs for use in new monitors due to "processing." As discussed, this was improper. In addition, as even the government now concedes, it was an incorrect statement of Colorado law. Under these circumstances, we are firmly convinced that Mr. Smith's testimony prejudiced the jury's ability to assess the government's theory of guilt based on the sale of intact CRTs for reuse in monitors.

Moreover, we cannot sustain the defendants' smuggling convictions on the alternative theory that the defendants violated Colorado law by shipping broken CRTs. Although the government introduced evidence that Executive did export broken CRTs, the evidence was disputed on the issue of whether the defendants knew the CRTs were broken. For example, Mr. Olson testified that he was not responsible for loading CRTs into shipping containers and that he attempted to prevent Executive's employees from breaking CRTs while packing them for export. Although the jury was certainly free to disregard this testimony and find both Mr. Richter and Mr. Olson possessed the requisite knowledge for conviction, it is impossible to tell whether the jury did so.

The government proffered two theories of guilt, one of which did not require knowledge that the CRTs were broken. From the general verdict, we can ascertain the jury found facts necessary to support one of the government's smuggling theories, but we cannot determine whether it was convinced the defendants knowingly shipped broken CRTs, or whether it incorrectly concluded, based on Mr. Smith's testimony, that the shipment of intact CRTs for reuse in monitors violated Colorado law. And we are not convinced the evidence of the defendants' knowledge that broken CRTs were exported was "sufficiently strong" to conclude that Mr. Smith's testimony was harmless. *Turner,* 285 F.3d at 914–15.

Finally, we are not convinced the district court's limiting instruction was sufficient to alleviate our grave doubt about the validity of the verdict in light of Mr. Smith's testimony. Although we presume jurors follow instructions given by the court, *United States v. Jones,* 530 F.3d 1292, 1299 (10th Cir.2008), the limiting instruction in this case did not cure the prejudicial impact of Mr. Smith's testimony. *See United States v. Riggi,* 541 F.3d 94, 104 (2d Cir.2008) (the presumption in favor of limiting instructions is inappropriate "where the prejudicial spillover was so overwhelming, [that the limiting instructions] cannot be presumed to be effective"). The limiting instruction here stated that "To the extent that Mr. Smith's testimony describes the law—or described the law in some way that is inconsistent with how the Court will later instruct you, you must disregard his testimony." If Mr. Smith had contradicted the court's subsequent instructions, this caution may have been effective. But Mr. Smith purported to instruct the jury consistently with the trial court's jury instruction. He informed the jury that under the court's definition, intact CRTs exported for use in new moni-

tors are waste because they cannot be used for their original intended purpose without processing. In short, Mr. Smith told the jury that the court's Waste Instruction required it to convict the defendants based on their admission that they exported CRTs for reuse in new monitors, because such reuse required processing, but he did not provide the jury with sufficient information to independently assess the basis of that opinion. Although the district court gave a limiting instruction, we are left with grave doubt that the prejudicial impact of Mr. Smith's testimony was cured. *See Specht*, 853 F.2d at 808–09 (holding the admission of expert testimony that exceeded the bounds of Rule 704 was prejudicial despite the fact that the court gave the jury a limiting instruction similar to the instruction in this case).

In sum, Mr. Smith's testimony was highly significant to the smuggling conviction because it was the only evidence offered to support the government's theory of liability based on the shipment of intact CRTs. And the prejudice from Mr. Smith's testimony was not mitigated by the district court's limiting instruction. From the general verdict it is impossible to tell which theory of smuggling was found by the jury. As a result, we reverse the defendants' convictions for smuggling in violation of 18 U.S.C. § 554.

**2. The Impact of Mr. Smith's Testimony on the Fraud Convictions**

Next, we turn to the defendants' fraud convictions. As discussed, the government's fraud case was predicated on three alleged misrepresentations: (1) that electronic devices would be disposed of in compliance with all local, state, and federal laws and regulations; (2) that these items

would be disposed of domestically, and not shipped overseas; and (3) that these devices would be completely destroyed in an environmentally safe manner. Mr. Smith's opinion about waste could not affect the government's attempts to prove the second or third theories of fraud. But for the same reasons discussed, it likely had a prejudicial impact on the jury's determination of whether CRTs exported for reuse in monitors are waste, and therefore whether the defendants complied with all local, state, and federal laws and regulations. And, as with the smuggling convictions, we cannot determine whether the jury's general verdict was based on one of the two permissible fraud theories or on the theory that depends on whether the defendants disposed of the e-waste in compliance with all environmental laws. We are left in grave doubt as to whether the error had a substantial influence on the jury's fraud verdicts, and we therefore reverse these convictions.

**3. The Impact of Mr. Smith's Testimony on Mr. Richter's Obstruction of Justice Conviction**

Finally, Mr. Richter contends his obstruction of justice conviction must be reversed because that, too, was tainted by Mr. Smith's testimony. To convict Mr. Richter of obstruction of justice, the jury was required to find beyond a reasonable doubt that he (1) knowingly altered, destroyed, mutilated, concealed, covered up, or falsified Executive's export shipping records, and (2) did so "with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction" of the EPA. *See* 18 U.S.C. § 1519. The government's obstruction of justice case turned, in large part, on a verbal request for records made to Mr. Richter by EPA inspector Eric

Johnson. Mr. Johnson testified that he asked Mr. Richter to turn over "bills of lading and shipping records, any documents related to the shipping of CRTs from Executive." He further testified that, pursuant to that request, Mr. Richter produced "three or four" bills of lading. Based on this limited production, the government advanced three alternative obstruction of justice theories. First, the government presented evidence showing Mr. Richter failed to produce a substantial number of relevant, and requested, documents pertaining to the shipment of CRTs. Second, the government's evidence showed the GATU invoice had been intentionally altered and that Mr. Richter had access to the invoice and the capacity to make the alteration. Third, the government presented evidence demonstrating that relevant Executive documents, including the original GATU invoice, had been shredded.

Mr. Richter's principal defense relates to the government's first theory: that Mr. Richter obstructed justice by failing to produce *all* records related to Executive's shipment of CRTs. He argued that Mr. Johnson requested shipping documents pertaining to "CRT *waste*," not CRTs "*in general*." In essence, Mr. Richter's defense was that he lacked the requisite intent to impede or obstruct the government's investigation because he did not believe the CRTs exported by Executive for reuse fit the regulatory definition of "waste." On appeal, Mr. Richter now contends that Mr. Smith's erroneous testimony regarding the definition of waste tainted the obstruction of justice charge because a conviction for obstruction of justice depended on an accurate definition of waste. We are not convinced.

■ Unlike the convictions for mail and wire fraud and the underlying smuggling convictions, any impact Mr. Smith's erroneously admitted testimony had on the obstruction of justice charge was harmless. First, Mr. Smith's testimony is less relevant to the government's obstruction theories than those convictions; and second, the government's remaining evidence is significantly stronger.

As discussed, the dispute at trial regarding the government's first theory of obstruction was whether Mr. Johnson requested all records relating to CRT shipments, as Mr. Johnson testified, or only the records covering CRT waste, as Mr. Richter testified. However, even if Mr. Richter had a good faith belief that Mr. Johnson only requested records regarding waste shipments and even if Mr. Smith's testimony tainted the jury's understanding of the definition of waste, there is overwhelming evidence that Mr. Richter obstructed justice by altering the GATU invoice and then shredding the original document. Even under the narrowest interpretation of Mr. Johnson's request, Mr. Richter understood that broken CRTs are waste. And by the time of the document request, Mr. Richter knew that the GATU shipment included broken CRTs. Thus, Mr. Richter was aware, even under his version of events, that Mr. Johnson had requested documents related to the GATU shipment. Mr. Smith's testimony is irrelevant to the overwhelming evidence that Mr. Richter altered the GATU invoice before producing it to the EPA and then shredded the unaltered original. We therefore conclude the erroneous testimony did not have a "substantial influence" on Mr. Richter's conviction for obstructing justice. *United States v. Charley,* 189 F.3d 1251, 1270 (10th Cir.1999). Accordingly, we affirm that conviction.[14]

## IV. CONCLUSION

For the foregoing reasons, we RE-VERSE the defendants' convictions for smuggling and fraud, AFFIRM Mr. Richter's conviction for obstruction of justice, and REMAND for further proceedings consistent with this opinion.[15]

KELLY, Circuit Judge, concurring in part and dissenting in part.

I concur in the judgment reversing Defendants' convictions on the wire fraud, mail fraud, and smuggling counts on the grounds that Mr. Smith's testimony was both improper and prejudicial. I do not, however, join in those parts of the court's opinion concluding that the jury instruction regarding "waste" was proper under Colorado law and satisfied federal constitutional due process. In addition, I dissent from the court's judgment affirming Mr. Richter's obstruction of justice conviction. In my view, the flawed jury instruction and the government's impermissibly broad theory of "waste" require reversal of the wire fraud, mail fraud, smuggling, and obstruction convictions.

### A. The Waste Instruction

According to the court, the Waste Instruction was an accurate statement of governing Colorado law. It sidesteps the issue whether it was appropriate to incorporate the Department's informal interpretation into the instruction, instead con-cluding that the resulting instruction was proper given a regulatory ambiguity and general legislative intent. The court's conclusion, however, is premised upon its erroneous conclusion that the governing regulation, Part 273.2(f)(3), is ambiguous, thus permitting a court to consult external aides to discern a broader legislative purpose. I disagree with the court's view of statutory ambiguity and would hold that the district court's Waste Instruction was not a correct statement of governing Colorado law.

Everyone agrees that Part 273.2(f)(3) of Colorado's hazardous waste regulations was the proper starting point for the district court. In relevant part, the regulation provides that an electronic device or component (such as a cathode ray tube) becomes a "waste" "on the date the recycler determines that the device [or component] cannot be resold, donated, repaired, or refurbished," or otherwise determines that the device or component cannot be "directly reuse[d]" or resold for its usable parts.

The court concludes that this language is "susceptible to multiple valid interpretations"—one which contains an "original intended purpose" requirement and one which does not. Ct. Op. 1185–87. It reasons that the words "repair" and "refurbish" suggest the regulation contains such a requirement. Finding the regulatory

---

14. The defendants also contend the district court erred in excluding three e-mails defendants offered to show they lacked knowledge that Executive had shipped broken CRTs. The district court excluded the e-mails on the grounds they were both "self-serving" and hearsay. Because the e-mails are relevant only to the smuggling charges, which we have reversed on other grounds, we do not address this argument.

15. Volumes 6, 7, 8, and 11 of the appellate record were filed under seal. We issued a show cause order and have reviewed the parties' responses. We direct the clerk of the court to allow these materials to remain under seal.

language ambiguous, then, the court holds that the legislative intent of Colorado's hazardous waste program makes clear that Part 273.2(f)(3) exempts from the definition of "waste" only those electronic devices or components that can be resold, donated, repaired, or refurbished for their "original intended purpose." I disagree.

I see nothing ambiguous about Part 273.2(f)(3)'s plain language. By the regulation's plain terms, a device or component is not "waste" if it can be resold, donated, repaired, *or* refurbished. These terms are disjunctive, and therefore a device or component is not "waste" if a recycler determines that he can do *any* of those four things with the item (resell it, donate it, repair it, or refurbish it). And because several of these terms have no suggestion of an original use requirement, the jury should have been instructed on the plain language of the regulation: electronic devices and components are "waste" only if a recycler determines that those devices and components cannot be resold, donated, repaired, or refurbished.

Under the court's view, however, statutory language is ambiguous when an additional requirement, term, or limitation not contained in the statute's express language can be consistently added to the relevant language. This view has both practical and legal flaws. From a practical perspective, this view would find ambiguity in nearly every statute or regulation; additional requirements can almost always supplement express terms. From a legal perspective, this view is inconsistent with Colorado law, which holds that courts "cannot supply the missing language and must respect the legislature's choice of words." *Turbyne v. People*, 151 P.3d 563, 568 (Colo.2007); *see also People v. Diaz*, 347 P.3d 621, 625 (Colo.2015) ("The con-

struction of the majority below requires us to add words—that is, to read the phrase 'at the time of the assault' into the statute. But, in interpreting a statute, we must accept the General Assembly's choice of language and not add or imply words that simply are not there." (internal quotation marks and citation omitted)).

It is only by adhering to its broad theory of ambiguity that the court can conclude that "the regulation can also be reasonably interpreted to include an original intended purpose requirement." Ct. Op. 1185. It argues its analysis is supported by *People v. Disher*, 224 P.3d 254 (Colo.2010), and *People v. Madden*, 111 P.3d 452 (Colo. 2005). Again, I disagree.

In *Disher*, the Colorado Supreme Court rejected the defendant's argument that the phrase "intimate relationship" necessarily required a sexual relationship. 224 P.3d at 256. Although the court eventually turned to legislative history to *confirm* its reading of the relevant statute, it first noted the statute's plain language did not support the defendant's argument and stated that it would not "read language into the statute that is not there." *Id.* In essence, the court rejected the defendant's request to do precisely what the government attempts to do here: add a requirement to the express statutory language. *Id.* In *Madden*, too, the court looked to legislative history to resolve an ambiguity in Colorado's "prostitution of a child" statute. 111 P.3d at 459. There, however, the statutory definition strongly suggested that such "prostitution" might not require a commercial transaction, a meaning which would conflict with the common understanding of that term. *Id.* at 458–59. Thus, the court noted that strictly adhering to the statute's plain language would (a) conflict with the "plain and ordinary

meaning" of the term "prostitution," *id.* at 458–59, and (b) render the entire statute unnecessary because, without a commercial transaction element, the statute would be transformed into a general sexual assault statute, *id.* at 460 & n. 14. In this case, however, giving effect to Part 273.2(f)(3)'s plain language would neither create an internal conflict in the regulation's language nor render the regulation superfluous.

Although the court disclaims any reliance on the Department's Guidance Document by concluding that the "original intended purpose" requirement is discernible from general legislative intent—a conclusion I take issue with—this case is most analogous to *Tebbetts v. Whitson,* 956 P.2d 639 (Colo.Ct.App.1997). *Tebbetts* involved an administrative challenge to an inmate disciplinary hearing, where the inmate was charged with and sanctioned for possessing unauthorized legal papers. *Id.* at 640. The relevant regulation prohibited inmates from possessing "official papers or documents" but expressly exempted from this general prohibition documents related to judicial or administrative proceedings. *Id.* at 641–42. The correctional facility narrowly interpreted this exemption, however, finding that it exempted only legal documents related to the inmate himself; the documents possessed by Tebbetts pertained to the legal affairs of other inmates, not his own.

The state appellate court began by observing that agency interpretations are "generally entitled to great deference." *Id.* at 641. Despite that observation, the court vacated the inmate's discipline, finding that the plain language of the regulation controlled. First, the court noted that "the [regulation] on its face does not limit an inmate to possession of his or her own papers." *Id.* at 642. Whether an additional limitation could consistently be added to the express terms of the regulation was of no consequence. And second, the court relied on the fact that a separate regulation provided that offenses would be defined only by reference to published regulations. *Id.*

This case is strikingly similar to *Tebbetts.* For starters, the governing regulation, Part 273.2(f)(3), "on its face does not limit" permissible reuses of electronic devices and components to reuses only for an "original intended purpose." *Tebbetts,* 956 P.2d at 642. That requirement is nowhere to be found in the plain and unambiguous text of the regulation. And second, separate Colorado statutes make clear that agencies' informal interpretations do not carry the force and effect of a rule. Colo. Rev.Stat. § 25–6.5–102(2), which appears in the same sub-title of the Colorado code as the hazardous waste regulations, provides that informal policy statements and guidance "relating to the implementation, administration, *and enforcement*" of hazardous waste regulations do not carry the "force and effect of a rule." (emphasis added). Only rules promulgated pursuant to the state's Administrative Procedure Act are given binding effect. *Id.* That Act, in turn, provides that when the APA's formal rule-making requirements are bypassed in favor of less cumbersome procedures, agencies' "interpretative rules or general statements of policy" are not binding. *Id.* § 24–4–103(1). I therefore think *Tebbetts* is persuasive and conclude the Colorado Supreme Court would not have supplemented the regulatory language because (a) that language is plain and unambiguous and (b) several express legislative directives prohibit courts from giving legal effect to non-binding, informal agency interpretations.

Finally, this court justifies its conclusion by stating that Defendants' interpretation of·Part 273.2(f)(3) "would create a defect in Colorado's hazardous waste program by permitting conduct ... that falls below the environmental protections mandated by federal law," an outcome "contrary to the General Assembly's express goal and direction to the Department." Ct. Op. 1187. Even assuming this is true, it is not the job of the judiciary to ensure that Colorado's program is "consistent with" and "equivalent to" the federal program, as required by federal law. 42 U.S.C. § 6926(b). It is the job of the EPA and, to a lesser extent, the Department, to ensure that the state program is equivalent to the federal scheme. If, in order to be consistent with federal regulations governing CRTs and other electronic devices, it is necessary to limit the resale and reuse of those devices to uses for their "original intended purpose," then the Department is well within its authority to amend Part 273.2(f)(3) to say that. Absent such an amendment pursuant to the prescribed administrative procedures, I would not "read language into the [regulation] that is not there," even given a general legislative intent to maintain federal approval. *Disher*, 224 P.3d at 256.

Briefly, I note why I also disagree with the court's conclusion that the Waste Instruction satisfied constitutional due process. The court reasons that Defendants had sufficient fair notice because (1) the Waste Instruction was a foreseeable judicial interpretation of Part 273.2(f)(3), (2) Defendants were members of a specialized and technical field, and (3) evidence suggests that Defendants had actual notice of the Department's Guidance Document. I am not persuaded.

In my view, it was not foreseeable that the district court would interpret Part 273.2(f)(3) to include the "original intended purpose" limitation. It seems far-fetched, at best, to think that any court could have divined such a specific requirement given the general legislative purpose of the Colorado Hazardous Waste Management Act and the federal RCRA. And the other two points largely overlook the significance of the Colorado statutes discussed just above—Colo. Rev. Stat. §§ 25–6.5–102(2) & 24–4–103(1). Given those statutes, the issue is whether Defendants had fair notice that criminal liability could hinge entirely on an informal interpretation (which finds no suggestion in the regulation) that lacks the force and effect of law. Regardless of their status as members of a highly regulated field, it could not have been foreseeable to Defendants that a court—in a hazardous waste enforcement proceeding—would give binding effect to an interpretation that, by statute, lacks the authority to bind.

The court's approach today incentivizes state regulatory agencies to bypass the formal rule-making process in favor of the more expedient informal interpretations. This is not an incentive I would provide, given the stakes of criminal enforcement actions.

## B. *Obstruction of Justice*

Though the court affirms Mr. Richter's obstruction of justice conviction, I would also reverse that conviction for two reasons: (1) the erroneous Waste Instruction tainted the jury's verdict, and (2) there was insufficient evidence to support the government's alternate theories of obstruction.

As the court notes, the government's obstruction case turned almost exclusively on the testimony of EPA inspector Eric

Johnson. Mr. Johnson testified that he orally requested Mr. Richter turn over "bills of lading and shipping records, any documents related to shipping CRTs from Executive," 10 R. 1623–24, and that Mr. Richter failed to comply with this request by turning over only a few bills of lading. The government's theory of the case was that Mr. Richter failed to produce a substantial number of relevant, and requested, documents pertaining to the shipment of CRTs.

Mr. Richter claims he understood Mr. Johnson's request as one for documents pertaining only to "CRT *waste*," not CRTs "in general." Richter Br. 24–25. Mr. Richter testified that (a) Mr. Johnson requested only "[e]xport waste CRT shipping documents," 10 R.2062, (b) Mr. Johnson never followed up on the request after Mr. Richter provided initial documentation, *id.* at 2063, and (c) in his mind, he had complied with the request, *id.* at 2062. In essence, Mr. Richter argues that Mr. Johnson requested only documents pertaining to "waste"—and because Mr. Richter did not believe that the CRTs exported by Executive fit the regulatory definition of "waste," he did not believe records pertaining to shipments of reusable CRTs were within the scope of Mr. Johnson's request.

As discussed above, I conclude that Waste Instruction was improper. Relatedly, I would conclude that the Waste Instruction tainted the jury's verdict with respect to Mr. Richter's obstruction conviction. The government's entire case was predicated on the theory that *all* CRTs shipped by Executive—broken or unbroken, reusable or non-reusable—constituted regulated "waste." Given an erroneous definition of "waste," the jury was likely to conclude that, by failing to turn over *any*

documents related to the shipment of CRTs, Mr. Richter knowingly and intentionally obstructed the EPA's investigation into violations of hazardous waste laws. As the district court noted, this was an EPA compliance investigation, one which involved "reviewing the paperwork required for *hazardous waste* management compliance." 3 R. 674. Because I do not think that the jury could fairly evaluate the charges in this case with a flawed "waste" instruction, I would reverse.

As to the government's alternate theories of obstruction, I cannot agree with the court that there was "overwhelming evidence that Mr. Richter obstructed justice by altering the GATU invoice and then shredding the original document." Ct. Op. 1200. As I read the record, the government's evidence in support of these alternate theories is not enough to give rise to a reasonable inference that Mr. Richter shredded or altered the GATU invoice. For instance, the *only* evidence cited by the government to establish that invoices had been altered is the testimony of Executive employee Jessica Goetzfried. Aplee. Br. 54. But Ms. Goetzfried testified only that a customer invoice "appear[ed] to be manipulated," after the prosecutor pointed to a sequencing irregularity. 10 R. 992. She further testified that she did not alter the invoice and specifically noted that at least four other people had access to Executive's records, one of whom was Mr. Richter. *Id.* at 989. She did not testify that Mr. Richter altered the invoice. The government's evidence suggesting Mr. Richter shredded relevant documents to impede a government investigation is similarly lacking.

Considering the severity of the instructional error (and resulting spillover prejudice) and the lack of evidence to support

any of the government's alternate theories, I would reverse and remand for a new trial.