FILED
United States Court of Appeals
Tenth Circuit

March 15, 2021

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

BLANCA TELEPHONE COMPANY,

Petitioner,

v.

FEDERAL COMMUNICATIONS
COMMISSION; UNITED STATES
OF AMERICA,

Respondents.

Nos. 20-9510 and 20-9524

---

PETITION FOR REVIEW FROM
THE FEDERAL COMMUNICATIONS COMMISSION
(NOS. FCC 17-162 and FCC 20-28)

---

Timothy E. Welch, Hill and Welch, Silver Springs, Maryland, for Petitioner.

Scott Noveck, Counsel (Thomas M. Johnson, Jr., General Counsel, Ashley S. Boizelle, Deputy General Counsel, Richard K. Welch, Deputy Associate General Counsel, Federal Communications Commission, and Makan Delrahim, Assistant Attorney General, Michael F. Murray, Deputy Assistant Attorney General, and Robert B. Nicholson and Adam D. Chandler, Attorneys, United States Department of Justice, with him on the brief), Federal Communications Commission, Washington, D.C., for Respondents.

---

Before **TYMKOVICH**, Chief Judge, **BRISCOE**, and **BACHARACH**, Circuit Judges.

---

**TYMKOVICH**, Chief Judge.

Blanca Telephone Company is a rural telecommunications carrier based in Alamosa, Colorado. Its business ensures its customers have access to a basic level of telephone services in rural Colorado. To make this business profitable, Blanca must rely in part upon subsidies from the Universal Service Fund (USF), a source of financial support governed by federal law and funded through fees on telephone customers. And in order to receive subsidies from the USF, Blanca must abide by a complex set of rules governing telecommunications carriers.

The Federal Communications Commission[1] administers and enforces the rules governing distribution of USF support. Through an investigation begun in 2008 by the FCC's Office of Inspector General into Blanca's accounting practices, the FCC identified overpayments Blanca had received from the USF between 2005 and 2010. According to the FCC, Blanca improperly claimed roughly $6.75 million in USF support during this period for expenses related to providing mobile cellular services both within and outside Blanca's designated service area. As we describe in more detail below, Blanca was entitled only to support for "plain old telephone service," namely land lines, and not for mobile telephone services. Following the investigation, the FCC issued a demand letter

---

[1] We also refer to the FCC as the "agency" throughout the opinion.

to Blanca seeking repayment. The agency eventually used administrative offsets of payments owed to Blanca for new subsidies to begin collection of the debt.

Blanca objected to the FCC's demand letter and sought agency review of the debt collection determination. During agency proceedings, the FCC considered and rejected Blanca's objections. Now, in its petition for review before this court, Blanca challenges the FCC's demand letter and subsequent orders on a number of grounds. Blanca claims the FCC's decision should be set aside for three reasons: (1) it was barred by the relevant statute of limitations, (2) it violated due process, and (3) it was arbitrary and capricious.

On review of the agency's record, we AFFIRM the FCC's decision. We conclude the FCC's debt collection was not barred by any statute of limitations, Blanca was apprised of the relevant law and afforded adequate opportunity to respond to the FCC's decision, and the FCC was not arbitrary and capricious in its justifications for the debt collection.

# I. Background

## A. Factual Background

### 1. The Regime Governing Blanca

In this appeal we must decide whether Blanca, a local exchange carrier (LEC) under federal law, could receive USF support for costs associated with

providing mobile telephone services.[2]  In order to proceed, we first describe the laws governing Blanca as of 2005.

Blanca and other telecommunications carriers are governed by a vast regulatory scheme.  As telecommunications technology has become more advanced and complex, the laws and regulations governing such technology have tried to keep pace.  And as the country's population has shifted geographically, with many trading rural for urban living, the laws and regulations have tried to account for these demographic changes as well.

Throughout the latter-half of the twentieth century, it became less economically feasible for traditional phone companies to provide services to rural customers.  Faced with rugged terrain across open expanses, telecommunications carriers were wary to invest in and maintain expensive infrastructure.  And given the sparse populations of many of these areas, the limited economies of scale also weighed against such investments.

The Telecommunications Act of 1996 was passed to address this shortage of quality telecommunications services in rural parts of the country.  47 U.S.C. § 254(b)(3) ("Consumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas, should have access to

---

[2]  Throughout the opinion, we interchangeably use the terms "mobile," "cellular," and "wireless" to describe this type of service.

telecommunications and information services . . . reasonably comparable to those services provided in urban areas and that are available at rates that are reasonably comparable to rates charged for similar services in urban areas."). The Act sought to ensure that "universal service" was available to customers, regardless of where they lived. *Id.* Under the Act, Congress intended to incentivize carriers to serve rural customers by providing subsidies from the USF for services provided and infrastructure built in such high-cost areas. *See generally WWC Holding Co., Inc. v. Sopkin*, 488 F.3d 1262, 1267 (10th Cir. 2007) (discussing why the USF was created).

The USF is overseen by the FCC and administered by two private organizations. It is funded by mandatory contributions from carriers. 47 U.S.C. § 254(d); 47 C.F.R. § 54.706(a). The FCC sets the rules for distributing the funds. 47 U.S.C. § 254(k). The Universal Service Administrative Company (USAC) is an independent, non-profit corporation that is responsible for establishing the procedures for monitoring and distributing funds. *See generally United States ex rel. Shupe v. Cisco Sys., Inc.*, 759 F.3d 379, 381 (5th Cir. 2014) (describing the structure and function of USAC). USAC is also responsible for auditing carriers and providing reports to the FCC. 47 C.F.R. §§ 54.707(a), (c). The National Exchange Carriers Association (NECA) is a membership organization of telecommunications carriers that collects and audits accounting

reports from carriers.  *See generally Farmers Tel. Co., Inc. v. FCC*, 184 F.3d

1241, 1246–45 (10th Cir. 1998) (describing the structure and function of NECA).

USAC can obtain any reports submitted to NECA.  47 C.F.R. § 54.707(b).

As of 2005, USF funds could be distributed to eligible telecommunications

carriers (ETCs) for certain types of expenses.  *See* 47 U.S.C. § 254(e) (2002).

States were given the authority to designate which carriers qualified as ETCs.  47

U.S.C. § 214(e)(2) (1997).  And states also designated a service area for each

carrier.  *Id.* at § 214(e)(5).[3]  The service area was used to determine a carrier's

universal service obligations and support.  *Id.*

Within each service area, a state could designate one eligible carrier as the

incumbent LEC.  47 C.F.R. § 51.5 (2005); *see also* 47 U.S.C. § 153(26) (1997)

(defining LECs as companies "engaged in the provision of telephone exchange

service or exchange access," but not "engaged in the provision of commercial

mobile service . . . except to the extent that the Commission finds that such

service should be included in the definition of such term").  Other carriers

designated as ETCs by the state, but allowed to operate in an incumbent's service

area, were considered competitive ETCs.  *Id.* at § 54.5 (2005).

---

[3]  The area in which a rural carrier operates is also referred to as a "study area."  47 U.S.C. § 214(e)(5).  We use the two terms, service area and study area, interchangeably when discussing Blanca.

Congress did not intend for the USF to act as an unrestricted fund for eligible carriers to be distributed for any conceivable expense incurred while providing telecommunications services. Rather, "[a] carrier that receives such support shall use that support only for the provision, maintenance, and upgrading of facilities and services for which the support is intended." 47 U.S.C. § 254(e) (2002). For instance, "[a] telecommunications carrier may not use services that are not competitive to subsidize services that are subject to competition." *Id.* at § 254(k); *see also* 47 C.F.R. § 64.901(c) (2002) (reiterating the same prohibition on cross-subsidization specifically for incumbent LECs). To ensure USF support was only used for its intended purposes, the FCC implemented accounting rules for the various types of eligible carriers. 47 U.S.C. § 254(k) (2002) ("The Commission . . . and the States . . . shall establish any necessary cost allocation rules, accounting safeguards, and guidelines to ensure that services included in the definition of universal service bear no more than a reasonable share of the joint and common costs of facilities used to provide those services.").

The FCC implemented one set of accounting rules for incumbent LECs. Under these rules, incumbent carriers had to differentiate between expenses related to regulated and unregulated activities in their accounting. *See* 47 C.F.R. § 32.14 (2002). Regulated accounts would include expenses incurred for providing services to which a tariff filing requirement applied. *Id.* at § 32.14(a).

And nonregulated accounts were for "[p]reemptively deregulated activities and activities . . . never subject to regulation." *Id.* at § 32.23(a) (1999). When an expense involved both regulated and nonregulated activities, the carrier still had to allocate the costs attributable to each for accounting purposes. *Id.* at § 32.23(c); *see also id.* at § 64.901(a) (describing method for separating regulated from nonregulated costs). The incumbent carrier's expenses were then reported to NECA, detailing what services it provided. *Id.* at § 36.611 (2001); *id.* at § 69.601(c) (1995) (requiring all incumbent carriers to certify the accuracy of their reports to NECA); *see also In re Jurisdictional Separations and Referral to the Federal-State Joint Bd.*, 16 FCC Rcd. 11382, 11384–85 (2001) (describing the accounting process for incumbent carriers). From the outset, the FCC made clear that these "cost allocation rules are designed to prevent cross-subsidization of non-regulated activities." *In the Matter of Implementation of the Telecomms. Act of 1996: Accounting Safeguards Under the Telecomms. Act of 1996*, 11 FCC Rcd. 17539, 17565 (1996).

By contrast, competitive ETCs were governed by different accounting rules. 47 C.F.R. § 54.307(b) (2005). These carriers could receive identical support to the local incumbent for services provided in an incumbent carrier's service area. And this included funding for both fixed and cellular services. *Id.* at § 54.307(a); *see also In re Federal-State Joint Bd. on Universal Serv.*, 16 FCC Rcd. 11244,

11314 (2001) (clarifying that competitive eligible telecommunications carriers providing mobile services could use a subscriber's billing address for purposes of determining USF support); *In the Matter of High-Cost Universal Serv. Support*, 23 FCC Rcd. 8834, 8843–44 (2008) (explaining that the FCC never intended identical support to be used to subsidize wireless services, although that was how most competitive carriers used it). To receive USF support, competitive carriers needed to report to USAC the number of customers they served in an incumbent LEC's service area. 47 C.F.R. § 54.307(b) (2005). They did not need to allocate costs between regulated and nonregulated activities.

As of 2005, cellular services were considered nonregulated for accounting purposes. *See In the Matter of Amendment of the Comm'n Rule to Establish Competitive Serv. Safeguards for Local Exchange Carrier Provision of Com. Mobile Radio Servs.*, 12 FCC Rcd. 15668, 15691 (1997) ("The cost allocation rules, included in parts 32 and 64 of the Commission's rules, provide a basic framework for separating costs between LEC's regulated activities (such as provision of local exchange service) and nonregulated activities (such as provision of wireless service)."); *see id.* at 15691 n.102 ("The Commission has chosen to forbear from rate regulation of wireless services.").[4] As a result,

---

[4] Blanca insists cellular services were regulated because they were subject to mandatory tariff requirements under Colorado law. The Colorado law Blanca

(continued...)

incumbent LECs had to treat expenses associated with cellular services as nonregulated for accounting purposes.[5]

Incumbent LECs could receive USF support for one category of cellular services: basic exchange telecommunications radio services (BETRS). BETRS was a type of mobile radio service intended as a gap-filler for areas with particularly rough terrains. *See* 12 FCC Rcd. at 15710–11 ("We also believe that rural LECs may find it economical to use [commercial mobile radio services] licenses to provide fixed wireless services in remote areas as an alternative means of extending the local exchange network to unserved or hard to serve areas."). Rather than having a wired connection, the company would use BETRS to provide

---

[4](...continued)
cites to, 4 CCR 723-2-2122, does not transform cellular services into a regulated service for federal accounting purposes. To be sure, the federal regulations say state tariff requirements can cause an account to be treated as regulated. 47 C.F.R. § 32.14(b) (2002). But such accounts will not be treated as regulated "where such treatment is proscribed or otherwise excluded from the requirements pertaining to regulated telecommunications products and services by this Commission." *Id.* Federal law explicitly preempts state rate-regulation of cellular services. *See* 47 U.S.C. § 332(c) (1996). And, as the cited orders make clear, the FCC intended cellular services to be treated as nonregulated. 12 FCC Rcd. at 15691.

[5] The prohibition on USF support for cellular services for incumbent LECs was more explicit for a subset of these carriers. Some incumbent LECs had to establish subsidiaries to handle their commercial mobile radio services. 12 FCC Rcd. at 15672. This subsidiary requirements was intended to further protect against cross-subsidization. *Id.* at 15689 ("Improper cost allocation occurs when a LEC subsidiary shifts costs from its [commercial mobile radio services] to its regulated local exchange service."). Blanca, as a rural carrier, was exempt from the subsidiary requirement. *Id.* at n.11. But Blanca was not exempt from the reporting requirements intended to prevent against such cross-subsidization.

a customer with basic telephone service. The FCC's order made clear that BETRS was considered a fixed service and distinct from other cellular services. *See In the Matter of Amendment of the Comm'n Rules to Permit Flexible Serv. Offerings in the Commercial Mobile Radio Servs.*, 11 FCC Rcd. 8965, 8987 (1996) ("[W]e have determined that BETRS is a fixed service, rather than mobile service, and therefore BETRS providers are not subject to [commercial mobile radio services] regulations under Section 332."). As a result, costs associated with BETRS were considered regulated for accounting purposes.

## 2. Blanca's Conduct

Blanca is a telecommunications provider based in Alamosa, Colorado. It was originally incorporated in 1926. In 1997, Colorado designated Blanca as an incumbent LEC for parts of Alamosa and Costilla counties. Neither the FCC nor the state ever designated Blanca as a competitive ETC. And Blanca never submitted any of the reports required of a competitive ETC to claim identical support from the USF.

Starting in 2005, Blanca claimed USF support for all of its services, both fixed and cellular. And Blanca claimed USF support for expenses incurred both within and outside its study area.[6]

---

[6] There is some inconsistency regarding whether Blanca's services were BETRS. In its petition for reconsideration to the FCC, Blanca insisted that the

(continued...)

Blanca submitted its costs studies from 2005 onward to NECA. In 2012, NECA conducted a review of Blanca's 2011 cost study. And in 2013, NECA concluded that Blanca had impermissibly received USF support for costs incurred while providing nonregulated services, *i.e.*, cellular service. NECA advised Blanca to revise the 2011 cost study and any subsequent studies in which Blanca had failed to allocate its costs. Blanca then hired a cost consultant to review and revise Blanca's submissions from 2011 and 2012. Blanca eventually reached a settlement with NECA in 2013 based on overpayments identified in the revised cost studies.[7]

---

[6](...continued)
FCC previously "authorized Blanca's BETRS service using cellular technology by rule." R., Vol. II at 334–35 (citing *In the Matter of Revision of Part 22 of the Commission's Rules Governing the Mobile Servs., Report and Order*, 9 FCC Rcd. 6513, 6571 (1994)). But in its initial petition for agency review, Blanca claimed that it updated its previous BETRS system to new cellular technology and only continued using the term BETRS out of convenience. *See* R., Vol. I at 26 (explaining that, for its accounting, "Blanca continued use of the BETRS name merely for continuity purposes."). It also argued that "the BETRS discussion is a red herring" because "USF funding is available for mobile cellular services." *Id.*

Blanca misunderstands the FCC's position on BETRS. The FCC maintains it never authorized Blanca to treat all its cellular services as BETRS. It explains that Blanca improperly relied on an order that "only adopted a proposal to eliminate a prohibition on the offering of non-BETRS fixed service in cellular bands." R., Vol. II at 405. Leading up to 2005, the FCC's position was that BETRS was strictly a fixed service. *See* 11 FCC Rcd. at 8987.

[7] This settlement only covered a 24-month period from 2011 to 2012. By contract with its members, NECA is only authorized to conduct "true-up" processes for up to a 24-month window.

-12-

### 3. The FCC's Investigation into Blanca

The FCC first began investigating Blanca's accounting practices in 2008. The following year, the FCC's Office of Inspector General issued subpoenas to Blanca for reports, filings, and correspondence that Blanca filed with NECA and USAC regarding USF support. After Blanca's settlement with NECA, the FCC eventually concluded Blanca had improperly reported and received overpayments from the USF from 2005 to 2010.[8] In particular, Blanca claimed and received USF support for nonregulated services both within and outside of Blanca's study area. The FCC relied on the same methodology employed by Blanca's cost consultant in the NECA settlement to identify the amount of the overpayments.

In 2016,[9] the FCC's Office of Managing Director issued a demand letter to Blanca, identifying the overpayments and requesting repayment. In particular, it faulted Blanca for "charateriz[ing] its cellular stations as Basic Exchange Telephone Relay Service (BETRS) facilities in its [cost studies]" and, by

---

[8] At one point, the FCC turned the case over to the Department of Justice to consider a possible claim under the False Claims Act. The Department never acted on this referral.

[9] While we affirm the FCC's decision, the agency has been far from exemplary throughout its investigation of and proceedings involving Blanca. For instance, the agency's commissioners acknowledged this action came far later than it should have. Commissioner O'Reilly said of the action against Blanca, "I am concerned . . . that the troubling conduct at issue here occurred between 2005 and 2010, was not discovered until 2012, and is only now being remedied. We must do better." R., Vol. II at 317.

including cellular service costs in its reports, "fail[ing] to comply with Parts 64, 36 and 69 of the FCC's rules." R., Vol. I at 2. These accounting practices "resulted in inflated disbursements to Blanca from [the USF]." *Id.* Reviewing books and records obtained through the earlier subpoenas, the FCC determined Blanca owed $6,748,280 from USF overpayments. The letter also indicated that Blanca could challenge the finding by submitting evidence to the FCC within 14 days of receiving the letter.

## B. Procedural Background

Blanca petitioned the FCC for review of the Managing Director's demand letter. It challenged the letter's findings on multiple grounds. Most significantly, Blanca argued the FCC's demand letter did not afford it the due process required under law. In 2017, the FCC issued an order in response to Blanca's petition, rejecting Blanca's claims and affirming the demand letter. Following this order, the FCC initiated collection of the debt from Blanca through administrative offsets, withholding USF support to which Blanca was otherwise entitled.

At the end of 2017, Blanca petitioned the FCC again, this time for a reconsideration of the agency's order.[10] In January of 2020, Blanca brought a

---

[10] The current petition is not the first time Blanca has sought review from a federal court on this issue. In 2016, Blanca went to the D.C. Circuit, seeking a Writ of Prohibition. The D.C. Circuit denied Blanca's petition and did not retain jurisdiction. Blanca then sought a mandamus order and injunction from this court

(continued...)

petition for review of the FCC's order to this court.[11]  In March of 2020, the FCC

affirmed the demand letter and order.  Blanca then filed a new petition for review

and a motion to supplement the record based on the FCC's final order.[12]

---

[10](...continued)
in 2017 to stop the FCC's debt collection through administrative offset.  Both the mandamus order and injunction were denied.  In 2018, Blanca then petitioned this court for review of the FCC's first order.  A panel of this court dismissed the petition on jurisdictional grounds, concluding that because the FCC was still considering Blanca's petition on reconsideration, there was no final agency action to review.  Later in 2018, the FCC petitioned this court for review again and the petition was again dismissed on jurisdictional grounds.

[11]  We had asked Blanca and the FCC to brief the jurisdictional issues for Blanca's January 2020 petition, 20-9510.  The parties completed briefing prior to the FCC's final order.  Most of the issues raised in 20-9510 were mooted by the FCC's final order on reconsideration.  *See N.M. Health Connections v. U.S. Health and Human Servs.*, 946 F.3d 1138, 1158 (10th Cir. 2019) (explaining that when an agency eliminates the issues on which petition for review is based, those issues are rendered moot).  In particular, Blanca had sought to compel the FCC to act (issue the final order) and sought review of whether the FCC acted within its statutory authority in its collection efforts.  With the FCC's final order and Blanca's new petition, 20-9524, we now have a final agency action and a full record to evaluate.

[12]  We deny Blanca's motion to supplement the record.  We presume the agency's record is complete absent clear evidence to the contrary.  *See Citizens for Alts. to Radioactive Dumping v. U.S. Dep't of Energy*, 485 F.3d 1091, 1097 (10th Cir. 2007).  We will allow extra-record evidence that the agency did not consider during proceedings in very limited circumstances, including where a party's standing is at issue.  *U.S. Magnesium, LLC v. EPA*, 690 F.3d 1157, 1165 (10th Cir. 2012).  The FCC has conceded Blanca's standing, so it is unnecessary to consider Blanca's extra-record evidence.

# II. Standard of Review

In evaluating the FCC's actions, we must bear in mind two different standards of review.

## A. Arbitrary and Capricious Standard

In acting, the FCC must comply with the Administrative Procedure Act (APA). And the APA authorizes courts to review agency action. 5 U.S.C. § 704.

In particular, the APA directs courts to "set aside agency actions, findings and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." *Id.* at § 706(2)(A). Arbitrary and capricious review by this court is narrow. *In re FCC 11-161*, 753 F.3d 1015, 1041 (10th Cir. 2014) (citing *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). We will not set aside the agency's action if it "is rational, based on consideration of the relevant factors and within the scope of the authority delegated to the agency by the statute." *In re FCC 11-161*, 753 F.3d at 1041(internal quotation marks omitted). We must uphold the agency's decision as long as the agency's path may "reasonably be discerned." *Id.* (internal quotation marks omitted).

## B. De Novo Standard

Blanca also contends the FCC violated its due process rights.

The APA requires us to "set aside agency actions, findings, and conclusions found to be . . . contrary to constitutional right." 5 U.S.C. § 706(2)(B). We review de novo any constitutional issues. *In re FCC 11-161*, 753 F.3d at 1041.

## III. Analysis

Blanca suggests that we can reverse the FCC on any one of three grounds: (1) the agency did not act within the relevant statutes of limitations, (2) it violated Blanca's procedural rights established by statute and the Constitution, and (3) its orders were arbitrary and capricious. We address each issue in turn.

### A. Did the FCC act within the applicable statute of limitations?

Blanca insists the FCC's action is time-barred. It points to two statutes that would preclude the FCC's action: 47 U.S.C. § 503 and 28 U.S.C. § 2462. According to Blanca, one of these statutes governs the FCC's action here and either statute would prevent the FCC from taking punitive actions against Blanca over a decade after the alleged violations occurred.

We do not agree. Rather, because the FCC's action is most properly characterized as debt collection, not punishment, the FCC had to comply with all requirements of the Debt Collection Improvement Act (DCIA), codified at 31 U.S.C. §§ 3711–17. The DCIA authorizes agencies to collect debts owed to the United States and contains no limitations period preventing the FCC's debt collection.

### 1. Legal Standard

Our default rule is that the government claim will not be time-barred. *United States v. Telluride Co.*, 146 F.3d 1241, 1244 (10th Cir. 1998). Congress must expressly set a statute of limitations to overcome this default rule. *Id.* When a party argues a government claim is barred by a statute of limitations, we must construe the statute in favor of the government. *Id.* at 1245.

The FCC and Blanca disagree about what statute should govern the agency's action. The FCC suggests its interpretation of the relevant statutes, and the applicability of those statutes to its decision, should control based on the deference owed to agencies under *Chevron, U.S.A. v. Natural Resource Defense Council*, 467 U.S. 837 (1984).

To determine whether an agency's interpretation of a statute is entitled to deference, we first determine whether the statute is ambiguous. *Chevron*, 467 U.S. at 842. If the statute is clear, we do not defer to the agency's interpretation. *Id.* at 842–43; *see also New Mexico v. U.S. Dep't of Interior*, 854 F.3d 1207, 1231 (10th Cir. 2017) (finding a statute clear, so declining to move to step two of the *Chevron* analysis). But if it is ambiguous or silent about the relevant issue, we defer to the agency's interpretation unless it is arbitrary, capricious, or manifestly opposed to the plain meaning of the statute. *In re FCC 11-161*, 753 F.3d at 1041 (citing *Chevron*, 467 U.S. at 844).

We also do not give any *Chevron* deference to an agency's interpretation of statutes that are outside of the agency's expertise. *Hydro Res., Inc. v. EPA*, 608 F.3d 1131, 1145 (10th Cir. 2010) ("Courts do not . . . afford the same deference to an agency's interpretation of a statute lying outside the compass of its particular expertise and special charge to administer."). We review such statutes de novo. *Id.*

### 2. Application

Here, Blanca and the FCC each point to different statutes that they argue should apply here. Blanca insists the FCC must have acted under either 47 U.S.C. § 503 or 28 U.S.C. § 2462 in issuing the demand letter and initiating debt collection. The statutes require certain types of government actions to be brought either within one year, *see* 47 U.S.C. § 503(b)(6), or five years, *see* 28 U.S.C. § 2462, respectively—both of which would bar the FCC's actions toward Blanca. The FCC, though, says that its actions are authorized by the DCIA. And the DCIA contains no statute of limitations for administrative offsets. 31 U.S.C. § 3716(e)(1) ("Notwithstanding any other provision of law, regulation, or administrative limitation, no limitation on the period within which an offset may be initiated or taken pursuant to this section shall be effective.").

In its orders, the FCC interpreted each statute as it relates to recovering overpayments from Blanca. The FCC argued it was not acting under 47 U.S.C.

-19-

§ 503. Rather, according to the orders, "[t]he commission or USAC has consistently sought recovery of USF funds outside of section 503 proceedings." R., Vol. II at 310. This is because "[n]either the plain language of section 503 of the Act nor its legislative history indicates that Congress intended that section to govern debt determinations." *Id.* The FCC also insists the collection is not pursuant to 28 U.S.C. § 2462, which governs penalties, not debt collection.

We do not afford the FCC any deference in interpreting the DCIA or 28 U.S.C. § 2462, because neither statute was specifically entrusted to the FCC to administer. *Hydro Res., Inc.*, 608 F.3d at 1146. Also, because 47 U.S.C. § 503 is not ambiguous about the type of agency action it covers, we do not afford the FCC's interpretation of it any deference. *New Mexico v. U.S. Dep't of Interior*, 854 F.3d at 1231. We review the statutes de novo.

Both 47 U.S.C. § 503 and 28 U.S.C. § 2462 authorize agencies to impose penalties against regulated entities that violate the law. Section 503 states that a person who willfully and repeatedly fails to comply with the FCC's rules or regulations "shall be liable to the United States for a forfeiture penalty." 47 U.S.C. § 503(b). Section 503 further clarifies that "[a] forfeiture penalty under this subsection shall be *in addition to* any other penalty provided for by this chapter." *Id.* (emphasis added). Section 503 is used to penalize above and beyond other remedies.

Section 2462 is not specific to any agency. It authorizes suits or proceedings by the United States to enforce civil fines, penalties, or forfeitures. 28 U.S.C. § 2462. The Supreme Court has made clear that § 2462 governs only actions that penalize. Fines, penalties, and forfeitures each "refer to something imposed in a punitive way for an infraction of public law." *Kokesh v. SEC*, 137 S. Ct. 1635, 1643 (2017) (internal quotation marks omitted).

The DCIA, by contrast, is aimed at pure debt collection. It authorizes agencies to collect "a claim of the United States government for money or property arising out of the activities of, or referred to, the agency." *See* 31 U.S.C. § 3711(a)(1). A claim is "any amount of funds or property that has been determined by an appropriate official of the Federal Government to be owed to the United States." *Id.* at § 3701(b)(1). This includes overpayments, specifically "payments disallowed by audits performed by the Inspector General of the agency administering the program." *Id.* at § 3701(b)(1)(C). If the head of an agency attempts to collect a claim through the methods described in § 3711 to no avail, the agency may collect the debt through administrative offset. *Id.* at § 3716(a).

These statutes are not ambiguous. Sections 503 and 2462 apply to punitive agency action; the DCIA applies to debt collection of funds owed to the United States. In that light, we must answer two questions to determine which statute governs the FCC's collection efforts and which statute of limitations applies.

-21-

First, do the FCC's actions constitute a penalty? Second, if the action is not a

penalty, are the overpayments from the USF "owed to the United States"?

### a. Penalty or Debt Collection

The Supreme Court recently provided a framework for determining whether

an agency action constitutes a penalty in *Kokesh*. *See* 137 S. Ct. 1635. The SEC

had sought a disgorgement judgment against Kokesh for violations of federal law

that occurred over an almost fifteen-year period. The district court ordered

disgorgement of money illegally obtained during this time. On appeal, Kokesh

argued the disgorgement operated as a penalty, so it should have been barred in

part by the five-year statute of limitations in 28 U.S.C. § 2462. To decide

whether the statute of limitations applied, the Court had to determine whether an

SEC disgorgement was a penalty within the purview of § 2462.

To determine whether the SEC's disgorgement was punitive, the Court

considered two guiding principles: (1) whether the agency's action is redressing a

wrong to the public or to a private party and (2) whether the agency's action is

taken for punitive purposes, *e.g.*, to deter others from committing a similar

violation. *Id.* at 1642. The Court concluded the disgorgement was a penalty. The

disgorgement was enforced against Kokesh for a violation of public laws,

intended to deter future violators, and not strictly compensatory. *Id.* at 1643–44.

Because the disgorgement carried the hallmark traits of a penalty, the SEC's

disgorgement was partially barred by the five-year statute of limitations in § 2462.

Blanca argues the FCC's action here is like the disgorgement in *Kokesh*. It

asserts the collection effort is punitive because the violation was of a public

accounting law and the FCC's ultimate purpose is deterrence. Blanca points to

the demand letter and subsequent orders as proof of the action's true nature. The

FCC identifies a goal of rooting out "fraud, waste, and abuse" throughout its

orders. Opening Br. at 48. And the FCC identified the harms Blanca's actions

caused the public and the marketplace.[13] The FCC also described the collection

effort as "enforcement activity" in a later order. Reply Br. at 15 (citing

*Memorandum and Opinion Order*, 34 FCC Rcd. 2590, 2600 (2019)).

In response, the FCC contends that it is not punishing Blanca. Rather, the

debt collection is intended to do nothing more than return Blanca to "the status

quo." Resp. Br. at 47. The FCC insists the mere "belief the sanction is costly or

painful does not make it punitive." *Id.* (quoting *Telluride*, 146 F.3d at 1247).

We agree with the FCC that *Kokesh* does not compel us to conclude the

reimbursements are a penalty.

---

[13] Blanca also argues that the FCC's referral of the matter to the Department of Justice in 2014 makes the action punitive. We do not agree. Simply because the FCC referred the matter to the Department to explore the possibility of an enforcement action does not make the debt collection punitive.

First, we have previously concluded that just because a party violated a public law and because an agency wants to protect the public through a subsequent action does not necessarily make that action a penalty. *See Telluride*, 146 F.3d at 1246 ("[W]e see no reason to include all wrongs to the public as penalties."). The Supreme Court's decision in *Kokesh* did not change that. The identity of the wronged party is just one guiding principle when deciding whether government action is punitive. The fact that Blanca's accounting violations wronged the public as opposed to a discrete private party does not decide the issue for us.

Looking to the second principle—the purposes underlying the FCC's actions—convinces us the collection efforts are not a penalty. The FCC's purpose was compensation for the overpayment. *Kokesh*, 137 S. Ct. at 1642 ("[A] pecuniary sanction operates as a penalty only if it is sought for the purpose of punishment . . . as opposed to compensating a victim for his loss.") (internal quotation marks omitted). In the orders, the FCC sought only repayment of the amount overpaid out of the USF to Blanca.[14] The fact that it also identified how

---

[14] Blanca has drawn our attention to the fact that the FCC has increased the amount owed since litigation began, adding $3.5 million to the original $6.75 million debt. Blanca says this amount is made up of "explicit penalties." Opening Br. at 49. We do not think late fees or the inclusion of interest transforms the FCC's action into a penalty. The fact that the government assesses a late fee does not alter the underlying purpose of the FCC's action. It is simply a
(continued...)

its action might protect the public or marketplace from harm does not transform the underlying nature of the action. *See Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 662–63 (1985) ("Although recovery of misused . . . funds clearly is intended to promote compliance with the requirements of the grant program, a demand for repayment is more in the nature of an effort to collect upon a debt than a penal sanction.").

Blanca's arguments about the FCC's self-description of the collection efforts as "enforcement activity" and as aimed at rooting out "waste, fraud, and abuse" are unavailing. A single, passing reference to the collection as an "enforcement activity" does not transform it into a penalty. And while the FCC used the phrase "waste, fraud, or abuse" at times to describe its justification for undertaking audits and investigations, it also stressed that the present action was solely to recover USF support improperly disbursed, *not* to punish for waste, fraud, or abuse. *See, e.g.*, R., Vol. II at 311 ("Here the Commission is merely seeking to recover sums improperly paid.").

### b. Funds Owed to the United States

Even if the collection effort is not a penalty, we must ensure the FCC is collecting "funds . . . owed to the United States." 31 U.S.C. § 3701(b)(1).

---

[14](...continued)
recognition of the time-value of money.

The FCC has interpreted the DCIA to cover overpayments from the USF. *See* 47 C.F.R. § 1.1901(b). But the FCC has no particular experience in interpreting the DCIA, so we do not defer to the FCC's interpretation. Rather, we review de novo whether overpayments from the USF fall within the DCIA.

Blanca contends USF overpayments are not funds owed to the United States. According to Blanca, the DCIA does not apply here because the USF is funded by contributions from carriers. So, any overpayments out of the fund would be owed directly to the USF, not to the United States.

Blanca points to an out-of-circuit case to bolster its argument. *See United States ex rel. Shupe v. Cisco Sys.*, 759 F.3d 379 (5th Cir. 2014). In *Shupe*, the Fifth Circuit had to determine whether a party had violated a previous version of the False Claims Act, 31 U.S.C. § 3729 (2008), by lying on applications for USF support. A person violated the False Claims Act if he "knowingly ma[de], use[d], or cause[d] to be made or use[d], a false record or statement to get a false or fraudulent claim paid or approved by the government." 31 U.S.C. § 3729(a)(2) (2008). And it defined "claim" as "any request . . . for money . . . if the United States Government provides any portion of the money." *Id.* at § 3729(b) (2008).

In *Shupe*, the Fifth Circuit determined the United States government did not provide any portion of the money for the USF, so the defendant could not be prosecuted under the False Claims Act. In coming to this conclusion, the court

emphasized the control USAC exercises over the USF and the fact that the statute did not extend to funds overseen by such private parties. 759 F.3d at 387–88. The FCC's regulatory supervision of the USF was insufficient to consider payments made from it as "provided by the United States." *Id.* at 388.

*Shupe* does not dictate our decision here. We face a different statutory scheme with different language. While the False Claims Act limited a claim to money that the United States provides any portion of, the DCIA defines claim more expansively. It expressly includes overpayments "disallowed by audits performed by the Inspector General of the agency administering the program." 31 U.S.C. § 3701(b)(1)(c). The overpayments at issue fall within that description.

Blanca asserts the DCIA does not apply because the FCC's Inspector General did not produce a formal audit or adverse finding. It faults the FCC for issuing the demand letter through the Managing Director rather than the Inspector General. But in both the demand letter and orders, the FCC claimed to be acting on an audit by the Office of Inspector General. *See* R., Vol. I at 1–2 ("Our determination follows an investigation by the FCC's Office of Inspector General."); *see also* R., Vol. II at 299 ("Based on its investigation and review of documentation provided by Blanca, [the Office of Inspector General] concluded that Blanca had misallocated costs between its CMRS and wireline services."). Here, the FCC's Office of Inspector General conducted an investigation and

concluded Blanca had misallocated costs. This is enough to bring the overpayments within the scope of the DCIA.

*   *   *

The FCC's action is not barred by a statute of limitations. While Blanca argues the FCC was statutorily barred from collecting the overpayments, the statutes on which it relies do not apply. Rather, the overpayments are covered by the DCIA, which has no statute of limitations for administrative offsets.

### B. Did the FCC violate Blanca's due process rights?

Blanca also claims the FCC did not comply with statutory and constitutional procedural requirements in initiating the debt collection. Specifically, Blanca argues the FCC engaged in a summary adjudication that gave Blanca insufficient notice and no meaningful opportunity to respond. In addition, Blanca insists that the laws, regulations, and orders in place as of 2005 failed to give it fair notice that its conduct was prohibited.

Blanca fails to establish a due process violation. Although the underlying regime governing USF distributions is complex, Blanca had adequate notice that it could not receive USF funding for providing cellular services. Furthermore, in identifying the rules violated and starting the debt collection process, the FCC provided all the process required by statutes and the Constitution.

### 1. Legal Standard

#### a. Statutory Process

The APA "expressly provides for two categories of administrative hearing and decision: rulemaking and adjudication." *Phillips Petroleum Co. v. Federal Power Comm'n*, 475 F.2d 842, 851 (10th Cir. 1973). And it identifies procedures agencies must provide for each type of action.

Here, the FCC acted through an informal adjudication. It has very broad discretion to decide whether to proceed through adjudication or rulemaking when "interpreting and administering its statutory obligations under the [Telecommunications Act]." *Conf. Grp., LLC v. FCC*, 720 F.3d 957, 965 (D.C. Cir. 2013). It is appropriate for an agency to use informal adjudications in making individualized determinations. *See Sinclair Wyo. Refining Co. v. EPA*, 887 F.3d 986, 992 (10th Cir. 2017); *see also Nat'l Biodiesel Bd. v. EPA*, 843 F.3d 1010, 1017–18 (D.C. Cir. 2017) (stating that adjudications characteristically are "highly fact-specific, case-by-case" proceedings).

Procedurally, the APA imposes "minimal requirements" on informal adjudications. *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 655 (1990). The agency must only notify a party that it is denying a petition and provide the grounds for denial. 5 U.S.C. § 555(e); *see also Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d. 1183, 1197 (10th Cir. 2014) ("When an

-29-

agency undertakes an informal adjudication, we require only that the grounds upon which the agency acted be clearly disclosed in, and sustained by, the record.") (internal quotation marks omitted and alterations incorporated).

Beyond the APA, the DCIA also has its own procedural requirements.[15] In order to use administrative offsets to recover debt, the agency must give the debtor: (1) written notice of the type and amount of the claim, the intention to collect the claim by administrative offset, and an explanation of the debtor's rights; (2) an opportunity to inspect and copy the agency's records regarding the claim; (3) an opportunity for review by the agency of the claim decision; and (4) an opportunity to make a written agreement with the agency head to repay the claim. 31 U.S.C. § 3716(a). If an agency "previously has given a debtor any of

---

[15]  Blanca also insists that the FCC failed to comply with the procedural requirements of 47 U.S.C. § 503(b)(4).  Section 503 requires the FCC to provide notice of apparent liability prior to imposing a forfeiture penalty.  This requirement is inapplicable here.  As previously discussed, *see supra*, III.A, we believe Blanca's actions are governed by the DCIA, not § 503.

This also resolves another of Blanca's arguments: that the FCC treated it differently than similarly-situated telecommunications carriers, who received notices of apparent liability prior to FCC proceedings.  Blanca is comparing apples and oranges.  The other carriers were treated differently because they were subject to forfeiture proceedings under 47 U.S.C. § 503. The FCC has made clear that in the proceedings Blanca references, the FCC "invoked the forfeiture process only to seek penalties in addition to, and separate from, seeking repayment (and indeed after the companies at issue had already returned the improper payments)." Resp. Br. at 39. The differential treatment was appropriate.

the required notice and review opportunities with respect to a particular debt, the agency need not duplicate such notice and review opportunities before administrative offset may be initiated." 31 C.F.R. § 901.3(b)(4)(iv).[16]

### b.  Constitutional Due Process

The Fifth Amendment also requires the federal government to provide a baseline level of due process when depriving a person of life, liberty, or property. U.S. Const. amend V.  Procedural due process requires fair notice that conduct is prohibited and, prior to a deprivation, meaningful notice and opportunity to be heard. We discuss the contours of each aspect of due process below.

First, due process requires the government to "give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden" before withdrawing a benefit.  *United States v. Richter*, 796 F.3d 1173, 1188 (10th Cir. 2015) (internal quotation marks omitted).  "A fundamental principle in our legal

---

[16]  We note that Blanca made brief reference to another alleged procedural deficiency through a one-line footnote in its opening brief.  Specifically, Blanca insists the FCC violated its own rules by beginning debt collection prior to the end of litigation.  *See* Opening Br. at 34 (citing 47 C.F.R. § 1.1910(b)(3)(i)).  But Blanca does not explain why, on its theory, § 1.1910(b)(3)(I) should even apply in this case.  This regulation applies only to debt collection made under the DCIA.  And Blanca has specifically maintained throughout litigation that the FCC did *not* act pursuant to the DCIA.  Blanca has not argued before us, even in the alternative, that the DCIA applies here. Therefore, we conclude that Blanca has waived this argument.  *See Fuerschbach v. Sw. Airlines Co.*, 439 F.3d 1197, 1109–10 (10th Cir. 2006) (inadequately briefed and underdeveloped theories are waived).

system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Due process requires fair notice for two reasons. First, regulated parties need to know what is required of them so they may act accordingly. *Id.* Second, it prevents officers or agencies who enforce the law from acting in an arbitrary or discriminatory manner. *Id.*

Fair notice concerns will arise "when an agency advances a novel interpretation of its own regulation in the course of a civil enforcement action." *United States v. Magnesium Corp. of America*, 616 F.3d 1129, 1144 (10th Cir. 2010). It would be inappropriate for an agency, having long acquiesced in practice to one interpretation, to manufacture liability by retroactively applying a new interpretation. *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (10th Cir. 2012) ("To defer to the agency's interpretation in this circumstance would seriously undermine the principle that agencies should provide regulated parties fair warning of the conduct a regulation prohibits or requires.") (internal quotation marks and brackets omitted).

That being said, fair notice does not require an agency to publish an easily digestible, abridged version of its rules. Technical and complex regulations are often necessary to govern the conduct of parties involved in complex affairs. Thus, the requirements of due process are understood through the lens of parties

with special knowledge because we refer to "the common understanding of that group" to measure whether the party had fair notice. *Richter*, 796 F.3d at 1189. When regulations are addressed to such groups, "the standard is lowered and a court may uphold a statute which uses words or phrases having a technical or other special meaning, well enough known to enable those within its reach to correctly apply them." *Id.* No one doubts the complexity of telecommunications regulations and the famously detailed rules that apply to carriers operating in that environment.

Second, due process requires the government to provide "notice and opportunity for hearing appropriate to the nature of the case" prior to deprivation. *Riggins v. Goodman*, 572 F.3d 1101, 1108 (10th Cir. 2009) (internal quotation marks omitted). Notice and the opportunity to be heard "must be granted at a meaningful time and in a meaningful manner." *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972). "If the right to notice and a hearing is to serve its full purpose . . . it must be granted at a time when the deprivation can still be prevented." *Id.* at 81. But this does not mean a hearing must be held before the agency's *decision* to deprive. *See Riggins*, 572 F.3d at 1111 ("[D]ue process is required not before the initial decision or recommendation to terminate is made, but instead before the termination actually occurs.").

## 2. Application

### a. Statutory Process

The FCC complied with the relevant procedural requirements of both the APA and the DCIA.

First, the FCC fulfilled the requirements for an informal adjudication by providing Blanca with notice of its intention to collect the repayments and grounds for that decision. The initial demand letter satisfied the APA by identifying the FCC's decision and the reasons for that decision. The demand letter pointed to the relevant accounting regulations and described Blanca's conduct that had violated those regulations. The FCC's subsequent orders did the same.

The FCC also fulfilled the procedural requirements of the DCIA. In the demand letter, the FCC informed Blanca of the type and amount of the debt and its intention to collect. It gave Blanca an opportunity for review and to make an agreement with the agency's head on repaying the claim. While the FCC did not give Blanca an opportunity to review the agency record in the FCC's possession, it informed Blanca it had relied only on documents Blanca itself had submitted. Blanca already had the entire record in its possession. Because these documents were in Blanca's possession, the FCC did not need to give Blanca an additional opportunity to review them.

## b. Constitutional Due Process

Blanca also claims it did not have fair notice that its conduct was prohibited. And it insists the demand letter and subsequent orders did not provide the meaningful notice and opportunity to be heard that due process requires.

According to Blanca, the rules, orders, and regulations in place as of 2005 did not make clear that cellular services were ineligible for USF support. Rather, Blanca argues the demand letter and FCC orders were the first time the FCC interpreted the regulations in such a way to make Blanca's conduct illicit. As far as Blanca is concerned, the FCC's 2016 demand letter was a summary adjudication that in one fell swoop told Blanca its accounting practices were unlawful and that it was being punished for those practices. If Blanca's characterization was accurate, it would squarely implicate fair notice concerns.

But Blanca misconstrues the state of the law in 2005. The FCC's rules and orders were clear about limits on USF support for cellular services. As an incumbent LEC, Blanca had to allocate its costs between regulated and nonregulated accounts. 47 C.F.R. § 32.14 (2002). Cellular services were considered nonregulated, *see* 12 FCC Rcd. at 15691, so Blanca had to separate these costs from its other expenses. The FCC had previously explained that these accounting rules were intended to prevent carriers from using USF support to

subsidize their nonregulated services. 11 FCC Rcd. at 17565. Yet Blanca failed to properly allocate its regulated and nonregulated expenses.

Furthermore, Blanca could only receive USF support for services provided in its designated service area. 47 U.S.C. § 214(e)(5) (2002). Competitive ETCs could receive identical support from the USF for providing services beyond a single study area. 47 C.F.R. § 54.307(a) (2005). But Blanca never separately made the reports required of a competitive ETC and neither the FCC nor Colorado ever certified Blanca as a competitive ETC. *See* R., Vol. II at 306.

The statutes, regulations, and orders at issue here do not trigger fair notice concerns. It is undoubtedly inappropriate for agencies to create liability by advancing novel interpretations during administrative proceedings. *See* *Magnesium Corp. of America*, 616 F.3d at 1144. But, despite Blanca's contentions, the FCC did not engage in summary rule adjudication here. The demand letter and orders did not interpret any regulations for the first time. Rather, through the demand letter and proceedings, the FCC indicated why debt collection was appropriate under the relevant rules. The FCC's synthesis of the law to explain its decision to collect from Blanca does not require a separate adjudication or rulemaking.

The FCC's rules are, admittedly, labyrinthine and technical. But we attribute to Blanca the specialized knowledge of a telecommunications carrier.

Blanca should have known cellular services were considered nonregulated under the FCC's orders. It should have known that the accounting guidelines had been put into place to prevent carriers from using support for noncompetitive services to support competitive services. And it should have known that it never submitted the reports required of a competitive ETC to receive identical support. Between the statutes governing the USF, the FCC's regulations, and previous FCC orders, Blanca had adequate notice that it could not receive USF support for expenses related to cellular service either within or outside its study area.

Blanca also argues that the demand letter and subsequent FCC review did not provide meaningful notice and opportunity to be heard. First, Blanca insists the demand letter provided inadequate notice. It suggests the demand letter identified a regulatory "framework" Blanca had violated without identifying an actual rule violation. But the FCC did identify both the legal and factual underpinnings of its action. It identified three sections of accounting regulations Blanca had violated and thoroughly described what conduct it considered

improper—claiming USF support for cellular services as an incumbent carrier.[17] This notice was sufficient.

Blanca also argues the post-decision, pre-deprivation review the FCC provided Blanca was deficient. According to Blanca, the FCC should have held a hearing before the demand letter was issued. But our cases are clear: due process requires only a pre-*deprivation* hearing. *See Riggins*, 572 F.3d at 1110. And Blanca received such a hearing from the FCC.

Blanca also points to the FCC's subsequent initiation of administrative offsets as evidence that the post-decision review was constitutionally inadequate.[18] But by seeking to forestall any deprivation until the end of litigation, Blanca asks more than the Constitution requires. The administrative

---

[17] Admittedly, the three sections of accounting regulations are extensive and the FCC could have identified particular provisions of the accounting rules Blanca violated. But due process imposes a floor, not a ceiling. The notice provided in the demand letter was adequate, if not exemplary. This is aside from the fact that Blanca had recently reached a settlement with NECA over similar issues. The demand letter identified the precise issues dealt with in the settlement. The FCC provided Blanca adequate notice of the violations.

[18] The FCC did begin collections prior to the end of litigation. Blanca claims this was contrary to the FCC's own regulations. But even if the FCC's initiation of debt collection action was contrary to the FCC's own regulations, an issue we take no position on, this does not make the FCC's collection practices constitutionally suspect. *See United States v. Caceres*, 440 U.S. 741, 749–750 (1979) (an agency's failure to follow its own rules does not necessarily raise constitutional issues).

offsets began *after* the FCC provided Blanca with a hearing and considered all its objections. Such agency action satisfies due process.

*   *   *

The FCC did not deprive Blanca of either the statutory or constitutional process it was entitled to. The agency followed the procedures required for informal adjudications under the APA and for initiating administrative offsets under the DCIA. The law as of 2005 apprised Blanca that its conduct was prohibited. And the FCC's demand letter and subsequent procedure afforded Blanca notice and a meaningful opportunity to be heard.

### C. Did the FCC act arbitrarily and capriciously?

Finally, Blanca argues the FCC's decision to collect debt was arbitrary and capricious. It insists the FCC's demand letter and orders were inadequate in several ways. First, Blanca argues the FCC's decision to initiate debt collection deprived it of the benefits of its 2013 settlement with NECA. Second, Blanca argues the FCC ignored statutory provisions that allowed it to receive USF support for cellular service. And third, Blanca argues the record as a whole lacked substantial evidence to support the FCC's decision.

We do not consider the FCC's decisions on any of these issues to be arbitrary and capricious. Rather, the FCC's analysis is "reasoned and reasonable." *In re FCC 11-161*, 753 F.3d at 1071.

### 1. Legal Standard

Review under the arbitrary and capricious standard is narrow. *Id.* at 1041. In making its decision, the agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Renewable Fuels Ass'n v. EPA*, 948 F.3d 1206, 1254 (10th Cir. 2020) (internal quotation marks omitted), *cert. granted*, *HollyFrontier Cheyenne v. Renewable Fuels Ass'n*, __ S. Ct. __, 2021 WL 77244 (2021). The agency cannot rely on factors deemed irrelevant by Congress, fail to consider important aspects of a problem, or present an explanation that is either implausible or contrary to the evidence. *Renewable Fuels*, 948 F.3d at 1206. We will not set aside agency decisions that meet this baseline level of reasoning.

Beyond the agency's reasons for the decision, we are also authorized to evaluate the adequacy of the record supporting the decision. If the agency's decision is not supported by substantial evidence in the record, we must set it aside as arbitrary and capricious. *See Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1575 (10th Cir. 1994). For the evidence to be "substantial," the agency's record must contain enough facts supporting the decision that a "reasonable mind" could accept it as "adequate to support [the] conclusion." *Id.* at 1581. The evidence is inadequate if it is overwhelmed by other evidence or constitutes a mere conclusion. *Id.*

When determining whether the agency's decision was arbitrary and capricious, review is "generally based on the full administrative record that was before all decision makers." *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 739 (10th Cir. 1993). We assume the agency properly designated the record absent clear evidence to the contrary. *Id.* at 740. Even if the record is incomplete, "[t]he harmless error rule applies to judicial review of agency proceedings." *Id.* So, "errors in such administrative proceedings will not require reversal unless [the petitioners] can show they were prejudiced." *Id.*

## 2. Application

### a. The 2013 NECA Settlement

Blanca asserts that the FCC's decision to pursue debt collection is arbitrary and capricious because it failed to consider one of Blanca's arguments: the FCC's actions deprived Blanca of the benefit of its 2013 settlement with NECA. Blanca argues that it explicitly entered the settlement with NECA to "avoid protracted litigation." Opening Br. at 30. The FCC's orders, though, have resulted in just such costly and protracted litigation.

But the FCC did address the 2013 NECA settlement in its orders. There, the FCC explained that "NECA is a private association of wireline carriers, not a government entity, and accordingly has no authority to compromise or waive any claims on behalf of the government." R., Vol. II at 404. And the FCC noted that

under Blanca's settlement with NECA, Blanca still had an obligation to make any repayments from funds received outside of NECA's 24-month settlement window.

In its orders, the FCC pointed to one of our cases, *Farmers Tel. Co. v. FCC*, 184 F.3d 1241, 1250 (10th Cir. 1999), as support for this conclusion. In *Farmers*, we needed to determine whether NECA's interpretation of a regulation bound the FCC. We concluded that NECA "has no authority to perform any adjudicatory or governmental functions." *Id.* at 1246. Rather, "NECA is an agent of its members and has no authority to issue binding interpretations of FCC regulations." *Id.* at 1250. The FCC reasoned that if NECA's interpretations of regulations could not control the FCC, NECA's settlements were not binding on the FCC either.

We cannot say the FCC's decision to pursue debt collection after Blanca's 2013 settlement with NECA was arbitrary and capricious. In its orders, the FCC described NECA as a private entity, discussed the terms of the 2013 settlement between Blanca and NECA, and identified relevant precedent supporting its decision to pursue collection despite the settlement. The FCC's reasons are clear and cogent.

### b. Regulations Concerning Cellular Service

Blanca also argues the FCC ignored numerous regulations supporting Blanca's position. In particular, Blanca points to a score of regulations and

orders dealing with treatment of cellular services. *See, e.g.*, Opening Br. at 24–25 (citing 47 C.F.R. § 54.5 (2005) (defining "telecommunications carrier" to include those who provide wireless services); *id.* at § 54.101 (1998) (designating support for voice grade access to "public switched networks" with no reference to delivery method); *id.* at § 54.307(b) (2005) (fixing the service location of a wireless subscriber as the subscriber's billing address)). According to Blanca, these references to cellular services indicate that USF support was available for such services. If the FCC had ignored these various regulations in its orders, this would be grounds to set aside its decision as arbitrary and capricious.

In its orders and briefing, the FCC does not dispute that numerous regulations and orders make USF support available for certain cellular services. For instance, competitive ETCs could receive identical support, regardless of the technology used. And BETRS, as a regulated cellular service, was also eligible for USF support.

But the fact that *some* carriers could claim USF support for *some* cellular services did not mean *all* carriers could claim support for *all* cellular services. In its orders, the FCC explained that the regulations and orders about cellular services did not pertain to Blanca, an incumbent LEC. *See* R., Vol. II at 405 n.103 ("Blanca's many citations to rules and related orders referring to cellular service as an eligible service does not pertain to rate-of-return high-cost universal

-43-

service support, the kind of support Blanca received between 2005 and 2010.").

So, according to the FCC, Blanca's reliance on these various regulations and orders is misplaced.

The FCC's treatment of these various regulations dealing with cellular service was not arbitrary and capricious.[19] It did not ignore the regulations and orders Blanca cited. Rather, the FCC considered the regulations but found them inapplicable.

### c. The Adequacy of the Record

Finally, Blanca argues the FCC's record is incomplete, making the agency's reliance upon it arbitrary and capricious.[20] It identifies various documents not

---

[19] Blanca also argues "[t]he FCC's 'regulated v. unregulated' distinction in the context of 'mobile services' is unreasoned." Opening Br. at 27. In its orders, the FCC did distinguish regulated and unregulated activities. But in doing so it cited a number of regulations and previous orders that explain the significance of the distinction. *See, e.g.*, R., Vol. II at 305 (citing 11 FCC Rcd. at 17572). This distinction was not unreasoned.

[20] We construe Blanca's aside in its opening brief as a separate arbitrary and capricious argument. While discussing the inadequacy of the record, Blanca argues that the FCC's refusal to give it access to the Office of Inspector General subpoenas of NECA records that Blanca requested "is the epitome of arbitrariness." Opening Br. at 23. The FCC acknowledged this request in its orders. In responding to Blanca, the FCC pointed out that "Blanca did have access to the underlying cost data because [the Office of the Managing Director] explicitly based its financial accounting on the cost studies Blanca itself commissioned." R., Vol. II at 313. And the FCC further noted that "Blanca does not state that such records request has any bearing on its ability to challenge the Commission's [demand] Letter." *Id.* at 314 n.152. Given that Blanca already had access to any of the underlying records, we cannot say that the FCC's refusal was

(continued...)

included in the record, including the subpoenas from the FCC's Inspector General, Blanca's responses to those subpoenas, reports and papers from NECA, and Blanca's accounting records.

Blanca has presented clear and convincing evidence that the record before us is not the full administrative record the FCC had before it throughout the proceedings. The FCC references documents throughout the demand letter and subsequent orders that it did not include in the record presented to this court. To be sure, the FCC erred by depriving this court of the full administrative record.

Blanca raises only one argument regarding prejudice, though, contending "[t]here is nothing in the record to support the FCC's Orders." Opening Br. at 23. We disagree.

First, the record provides an adequate factual basis for the FCC's decision. The record includes evidence that Blanca claimed USF support for cellular services both within and beyond its designated study area. It reflects that Blanca did not distinguish between regulated and nonregulated activities in its accounting. And the record establishes that Blanca was never designated as a competitive ETC and never submitted the reports necessary to receive identical support as a competitive ETC. Blanca does not deny these facts. The subpoenas,

_____

[20](...continued)
arbitrary and capricious.

Blanca's responses, and Blanca's underlying accounting reports[21] would tell us little more than the record already does.

Second, the record provides an adequate legal basis for the decision. Blanca insists "[t]he FCC Orders rely upon a single, non-binding, non-record NECA cost allocation manual to support its view that Blanca's BETRS service is not eligible for USF funding." *Id.* at 29. But Blanca's characterization of the record is incorrect. Throughout the proceedings, the FCC provided much more than a single "NECA cost allocation manual" to support its view that Blanca had improperly received USF payments. *See, e.g.*, R., Vol. II at 304–07 (describing the regulations and orders that require proper cost allocation in order to determine USF support). Given that the FCC provided an adequate legal basis for its decision, any further NECA documents that the FCC relied on for its reasoning are not necessary. Inclusion of such documents in the record would not change our understanding of the underlying regulatory scheme or our decision.

---

[21] Blanca also insists the FCC's record is deficient because it does not include all the underlying accounting reports it relied on in reaching its decision. But Blanca has never argued the FCC miscalculated the overpayments. *See* R., Vol. II at 304 ("In reaching these conclusions, we emphasize that Blanca has conceded that it offered CMRS services and it has not challenged the accuracy of OMD's accounting of the aggregate high-cost support attributable to Blanca's inclusion of CMRS-related costs in regulated accounts between 2005 and 2010."). In fact, during oral arguments, Blanca's counsel conceded that it was not challenging the FCC's calculated debt amount. Blanca contests only the fact that *any* debt exists. Because Blanca does not dispute the FCC's calculations, Blanca has not convinced us that the failure to include the cost data is prejudicial.

Given that the administrative record supports the FCC's decision, the FCC's failure to include documents referred to in the record is harmless.

The foregoing analysis also leads us to conclude that the FCC's reliance on the record was supported by substantial evidence. The record contains undisputed facts about Blanca's conduct and accounting practices between 2005 and 2010. And these facts establish that Blanca requested USF support for cellular services during this time, that the cellular services were not fixed-BETRS, and that Blanca never submitted the reports necessary to claim USF support as a competitive ETC. A reasonable mind could accept this undisputed evidence in the record as adequate to support the FCC's decision.

\* \* \*

The FCC did not act arbitrarily and capriciously. The FCC supported its decision to initiate debt collection with an explanation of the rules Blanca had violated and a calculation of the overpayments Blanca had received. And the record, though incomplete, is adequate to support the FCC's actions.

## IV. Conclusion

We DENY Blanca's Motion to Supplement the Record. And we AFFIRM the FCC's decision to collect USF overpayments to Blanca through administrative offsets. We remand to the FCC for any further proceedings.